**W. H. GARRETT**

v.

**SOUTHERN RAILWAY COMPANY.**

Civ. A. No. 3465.

United States District Court
E. D. Tennessee, N. D.

May 8, 1959.

Hodges & Doughty, Knoxville, Tenn., for plaintiff.

Key & Lee, Knoxville, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

The plaintiff in this case was employed as a wheel moulder by Lenoir Car Works, a Tennessee corporation. He claims injuries from silicosis contracted from silica dust permeating the foundry. But the questions whether he had silicosis, and the amount of injury, are not reached in this phase of the case.

◼ The sole question here is whether defendant, Southern Railway Company (hereinafter referred to as Southern), which acquired the entire capital stock of Lenoir Car Works (referred to hereinafter as Lenoir) in 1904, the year of the latter's organization, so completely dominated Lenoir that the latter was but an adjunct, or instrumentality, of Southern. If it did, then the complainant would, for the purpose of this case, be an employee of Southern and would be entitled to recover under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. Because there is a real question that Lenoir is but an instrumentality of Southern, the plaintiff in order to protect his rights, has also brought suit in the State courts against Lenoir for Workmen's Compensation.

◼◼ The general rule is that stock ownership alone by one corporation of the stock of another does not thereby render the dominant corporation liable for the torts of the subsidiary unless the separate corporate existence of the subsidiary is a mere sham, or unless the control of the subsidiary is such that it is but an instrumentality or adjunct of the dominant corporation. Sheridan v. Pan-American Refining Co., D.C.N.Y. 123 F.Supp. 81. The general rule is also stated in an Annotation appearing in 50 A.L.R. 611. See also Kentucky Electric Power Co. v. Norton Coal Mining Co., 6 Cir., 93 F.2d 923, 926. Whether the subsidiary is an instrumentality of the owner corporation is a question to be determined from all the surrounding circumstances. Fletcher Cyclopedia Corporations, Sec. 43 (p. 157), Sec. 6222; Berkey v. Third Ave. R. Co., 244 N.Y. 84, 155 N.E. 58, 50 A.L.R. 599 (opinion by Cardozo); Costan v. Manila Electric Co., 2 Cir., 24 F.2d 383, 384. Items to be considered in reaching such a determination are common directorships, common officers, common fiscal set up, etc.

The plaintiff relies upon the following circumstances:

That all directors and officers of Lenoir are employees of Southern and live in Washington; that Southern owns all the

stock of Lenoir except five qualifying shares; that between 1942–1957 Lenoir sold to Southern, or its affiliates, over 30 million dollars worth of its products while selling approximately four and a half million to outside purchasers; that all profits of Lenoir went to Southern; that all claims of Lenoir employees for accidents are handled by the claim's office of Southern; that all litigation against Lenoir is handled by Southern's attorneys; that general accounting of Lenoir is handled in Washington by personnel of Southern; that the Railroad Retirement Board decided that employees of Lenoir were entitled to benefits under the Railroad Retirement Act, 45 U.S.C.A. § 215 et seq., because of the relationship between Lenoir and Southern; that Lenoir has the power of eminent domain; and that on May 13, 1904, the Board of Directors of Southern authorized the purchase of the entire capital stock of Lenoir.

Our question is whether these factors would establish Lenoir as the mere creature of Southern. The defendant railroad says that these matters are not controlling and to sustain its position emphasizes the following facts:

That although Lenoir sells the majority of its products to Southern or its affiliates, it does not sell to them exclusively and in the fifteen-year period prior to the suit sold twelve percent to other customers; that Lenoir maintains its offices and business in Lenoir City, Tennessee, although it concedes that the corporate and accounting offices are in Washington in a building owned by Southern; that the management of Lenoir is vested in a manager, Henry Marius, who has held the position continuously since July 1, 1945, is paid by Lenoir, and although he holds and votes the proxy of Southern at the annual stockholders meeting, he has no other connection with Southern; that never has any individual served at the same time as a Director of Lenoir and Southern; that the work of Lenoir is a specialty and in the last 20 years no official or supervising employee of Southern has by training, or experience, been

in a position to direct or supervise the operation of such a business; that Southern has not purchased all its wheels, steel and brass castings from Lenoir, but has bought substantial amounts from others; that Southern has followed the custom in the trade as to price quotations and supplying scrap material in its dealings with Lenoir, and all sales to Southern have been upon the basis of a bid price or negotiated price; that in every case Southern obtains bids from several manufacturers and purchases from the lowest bidder; that the manager of Lenoir establishes the prices of all prospective purchases, including that of Southern; that the manager expects to make a profit and is not informed by Southern of bids of its competitors even when the prices are negotiated; that bids are revised sometimes, but never with knowledge of the bids of competitors; that all sales are the result of the business judgment of the Manager and not the result of threats, persuasion or intimidation by Southern; that at no time has any individual occupied the same official position in both companies with the exception of corporate and financial officials; that Lenior has since 1919 been a duly qualified employer under the Tennessee Workmen's Compensation Law, T.C.A. § 50–901 et seq., and with the exception of this and several similar suits has settled all claims made under and covered by the Tennessee Workmen's Compensation Law; that Lenoir maintains a separate bank account and has never intermingled its funds with those of Southern; that the companies keep separate books and Lenoir pays its own taxes; that Southern issues no passes to the manager or any other employee of Lenoir; that Lenoir owns no track or rolling stock, publishes no tariffs, files no reports with the Interstate Commerce Commission and uses no facilities or property jointly with Southern; that claims of employees are investigated and settled by the Claim Department of the Southern Railway System, which likewise defends claims litigation; that the general accounting of Lenoir is handled

by the Accounting Department of the Southern Railway System, but local accounting is handled by Lenoir employees at Lenoir City; that salaries of employees of the System doing this general work are paid by Southern, but reimbursement of its fair proportionate part thereof is made by Lenoir and other members of the System at monthly intervals, and that the share of Lenoir is $2,000 monthly; that Lenoir makes separate collective bargaining agreements with its employees and there is no interchange of seniority between operations of Lenoir and the railroad, or vice versa; that Lenoir has its own legal counsel in Lenoir City, selected by its manager in addition to the use it makes of the Legal Department of the System.

Counsel have been commendably frank and candid in the pre-trial conference, and in answering interrogatories and filing exhibits. The factual data before the Court is not in conflict. The Court's responsibility is to determine whether Lenoir is operated as a sham for Southern, or as the instrumentality, or as an adjunct of its operation.

The facts set forth above outline with singular sharpness the relation between the two companies. The Court finds the existence of two distinct operations. There is no evidence that Southern dictated the management of Lenoir. In fact, the evidence indicates that Henry Marius was in full control of the operation. He established prices. He handled all negotiations in collective bargaining agreements. Lenoir paid local taxes, had local counsel, maintained Workmen's Compensation. There is no evidence that Lenoir was run solely for the benefit of Southern. In fact a substantial part of its requirements in the field of operation of Lenior were bought elsewhere. Lenoir sold substantial quantities to other companies. It operated no rolling stock and had nothing to do with the transportation business.

The situation here is not like that in Southern Pacific Co. v. Gileo, 351 U.S. 493, 76 S.Ct. 952, 100 L.Ed. 1357, where the railroad itself operated a wheel foundry. The only question there as to employee Aranda was whether his duties as a wheel moulder served to further interstate commerce. The Supreme Court decided he was entitled to the benefit of the Federal Employers' Liability Act.

But before the Gileo decision applies here we must first determine whether Lenoir was operated so tightly by Southern that it was an agency or instrumentality of Southern. In our opinion it was not. Policy decisions and pricings remained in the hands of Marius. Certain accounting and claims work was done in Washington to eliminate duplication. But there is no evidence that policy decisions of Lenoir were made or dictated by Southern. Marius operated the business as a going concern in the fields it was equipped to handle. Where Southern, or the Southern Railway System, did work for Lenoir there was careful accounting and adjustment of costs at the end of each month. The facts do not reveal the intimacy and inseparability of control which would lead the Court to hold that Southern and Lenoir were one and the same. There is no such control here as in Costan v. Manila Electric Co., supra.

Lenoir was not in the words of the Act a "common carrier by railroad." It was not performing what have been called non-delegable duties of the railroad. It was not an operator of a terminal, performed no switching or transportation functions at all. It was a manufacturer and plaintiff was one of its employees. It was hence not an "agent" of Southern in the sense used in some of the cases cited by the plaintiff, since it performed no common carrier operations. Chicago, M. & St. P. Ry. Co. v. Minnesota Civic & Commerce Ass'n, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229; Davis v. Alexander, 269 U.S. 114, 46 S.Ct. 34, 70 L.Ed. 186; Sinkler v. Missouri Pacific R. Co., 356 U.S. 326, 78 S.Ct. 758, 2 L. Ed.2d 799.

Defendant manufactured car wheels, bearings of various kinds and items of a related nature. Southern could produce such items for its own use and if it did

so would be liable in tort under the F.E. L.A. for accidents occurring in the activity. But Southern did not manufacture these things in its own plants. Although necessary to keep its rolling stock in good repair, the items could be purchased anywhere. In fact the evidence indicates that substantial purchases of these products were made elsewhere. If purchased of a completely independent company, no claim could be made that such company was an instrumentality of Southern.

The question only arises because of the ownership of Lenoir by Southern and because of the other relationships listed above. We come back to the question whether the control was such as to make Lenoir a mere adjunct of Southern. We repeat again that it was not. Friedman v. Vandalia R. Co., 8 Cir., 254 F. 292, 294; Atlantic Coast Line R. Co. v. Shields, 5 Cir., 220 F.2d 242, 246.

In a case not involving a tort the Court of Appeals for the Sixth Circuit has set down the following guide lines. Kentucky Electric Power Co. v. Norton Coal Mining Co., supra:

> "On the other hand, it is likewise well settled that a corporation is ordinarily an entity, separate and apart from its stockholders, and mere ownership of all the stock of one corporation by another, and the identity of officers of one with officers of another, are not alone sufficient to create identity of corporate interest between the two companies or to create the relation of principal and agent or to create a representative or fiduciary relationship between the two. If such stock ownership and potential control be resorted to only for the purpose of normally participating in the affairs of the subsidiary corporation in a manner usual to stockholders and not for the purpose of taking some unfair advantage of the subsidiary or using it as a mere adjunct to the main corporation or as a subterfuge to justify wrongdoing, their identity as separate corporations will not be disre-

garded but their respective rights when dealing with each other in respect to their separate property will be recognized and maintained. The extent of stock ownership and mere potential control of one company over another has never been regarded as the determining factor in the consideration of such cases. Something must be disclosed to indicate the exercise of undue domination or influence resulting in an infringement upon the rights of the subservient corporation for the benefit of the dominant one. Otherwise, the rights of the separate corporations in respect to their corporate property must be governed by the rules applicable in ordinary cases." [93 F.2d 926.]

This excerpt from the Kentucky Electric Power case was quoted with approval in a footnote to the case of Taylor v. Standard Gas & Electric Co., 10 Cir., 96 F.2d 693, 704. In that case the Court in considering the indicia of control quoted at length from Powell on Parent and Subsidiary Corporations:

> "There is respectable authority for the proposition that to justify the application of the instrumentality rule between parent and subsidiary corporation, there must be present in addition to the elements of control through stock ownership and common directorates and officers, elements of fraud or wrongdoing on the part of the parent corporation to the detriment of the subsidiary and third persons in their relations with the subsidiary.
>
> "Sections 5 and 6 of Powell on Parent and Subsidiary Corporations, in part, read:
>
> "'The Instrumentality Rule, in its shortest form, may now be stated:
>
> "'So far as the question of control alone is concerned, the parent corporation will be responsible for the obligations of its subsidiary when its control has been exercised to such

a degree that the subsidiary has become its mere instrumentality.

" 'The Instrumentality Rule is recognized in all jurisdictions in this country and our problem therefore is to determine the circumstances which render the subsidiary an "instrumentality" within the meaning of the decisions. This is primarily a question of fact and of degree.'

" 'The circumstances rendering the subsidiary an instrumentality. It is manifestly impossible to catalogue the infinite variations of fact that can arise but there are certain common circumstances which are important and which, if present in the proper combination, are controlling.

"These are as follows:

" '(a) The parent corporation owns all or most of the capital stock of the subsidiary.

" '(b) The parent and subsidiary corporations have common directors or officers.

" '(c) The parent corporation finances the subsidiary.

" '(d) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.

" '(e) The subsidiary has grossly inadequate capital.

" '(f) The parent corporation pays the salaries and other expenses or losses of the subsidiary.

" '(g) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

" '(h) In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.

" '(i) The parent corporation uses the property of the subsidiary as its own.

" '(j) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.

" ' (k) The formal legal requirements of the subsidiary are not observed.' "

In the case at bar only two of the eleven listed indicia occur, namely, the ownership of most of the capital stock of Lenoir by Southern, and possibly subscription by Southern to the capital stock of Lenoir. In our opinion the principles of the Kentucky Electric Power case apply here, and when applied we conclude that the control of Southern over Lenoir was not such as to constitute the latter an adjunct of Southern. The complaint must be dismissed.