### John R. CARNEY

#### v.

### PITTSBURGH & LAKE ERIE RAIL-ROAD COMPANY, a Corporation, Appellant.

#### No. 13906.

United States Court of Appeals Third Circuit.

Argued Oct. 19, 1962.

Decided March 27, 1963.

Gilbert J. Helwig, Pittsburgh, Pa. (Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on the brief), for appellant.

John M. Feeney, Jr., Pittsburgh, Pa. (Gene K. Lynch, McArdle, Harrington & McLaughlin, Pittsburgh, Pa., on the brief), for appellee.

Before McLAUGHLIN and HASTIE, Circuit Judges, and DUMBAULD, District Judge.

McLAUGHLIN, Circuit Judge.

In this Federal Employers' Liability action, appellee was injured while asleep and off-duty, as a consequence of his fall from a negligently maintained bed in the Pittsburgh & Lake Erie Railroad Young Men's Christian Association in Campbell, Ohio.

Plaintiff, a communications lineman, was assigned with his gang to work on a project at defendant's yard near Youngstown, Ohio. Since he lived and had his headquarters in Pittsburgh, defendant had the option under its contract of transferring plaintiff to Youngstown and requiring him to pay his own expenses there or it could leave his headquarters in Pittsburgh and pay his expenses at Youngstown. Defendant chose the latter course and arranged for plaintiff and his gang to stay at the "railroad 'Y'" at Campbell. Plaintiff lived there during the week, eating two meals a day at its restaurant and taking out a lunch supplied by the "Y". He went home to Pittsburgh on weekends. This routine was followed for several months prior to May 3, 1957, the date of the accident.

Initially, we are faced with the question of whether Carney was covered by the provisions of the Federal Employers' Liability Act at the time he fell: was he "employed" within the meaning of § 51.[1] Very nearly on all fours on the point is the case of Mostyn v. Delaware, L. & W. R. R., 160 F.2d 15 (2 Cir., 1947). Mostyn involved a track worker who was housed and fed in a "bunk car" by a third party that was under contract with the railroad. Because of the verminous condition of his bunk plaintiff took his blankets and slept outside near the track, where he was subsequently struck by a passing train. The opinion indicates that although the plaintiff Mostyn was privileged to sleep in the bunk car (at his own expense), he could also, if he wished, have slept in other accommodations available in the town. Although the contention of the railroad that plaintiff had quit his job prior to the accident was not accepted, apparently he was not "on call". The court held that the function of housing and feeding the plaintiff under these circumstances was one of those activities "which, though literally not part of the work, are necessary to its performance" and stated, 160 F.2d at 17–18:

> "It seems to us that when a railroad provides shelter or food or both for its employees, and they are using the accommodations so provided to prepare themselves for their work, or to rest and recuperate, they must be regarded as in its 'employ' ".

We later approved of the principles laid down in Mostyn in Casso v. Pennsylvania R. R., 219 F.2d 303 (3 Cir., 1955), where plaintiff was hit by a passing train while walking back to his bunk house from a day off.

The facts here are, in some respects, stronger than those in Mostyn and Casso. Plaintiff's expenses at the Y.M.C.A. were billed directly to defendant and paid on a monthly basis. There was conflicting testimony as to whether plaintiff, in the pe-

1. Section 51 provides in pertinent part: "Every common carrier by railroad * * * shall be liable in damages to any person suffering injury while he is employed by such carrier * * *."

riod prior to his accident, was free to live in other accommodations having rates similar to those of the "Y" and be reimbursed therefor by the railroad. Apparently at oral argument before the district court on its motion for judgment n. o. v. defendant conceded that it would not have paid or reimbursed plaintiff for his living expenses unless he stayed at the "Y". In any event, we have the essential common elements of Mostyn and Casso in that defendant provided plaintiff with shelter and food, which by custom and the economic realities of the situation he and his work group were encouraged to use. The case clearly comes within the framework of Mostyn and is in harmony with those decisions which have found related activities to be "necessarily incident" to one's employment.[2]

■ Our second problem is whether the trial court correctly ruled under the facts that the " * * * defendant was responsible for any negligence in the maintenance of the facilities which resulted in the injuries sustained by plaintiff in this case." The railroad had sent Carney and seven other of its communication linemen specially from Pittsburgh to Campbell, Ohio for the purpose of " * * * putting a new job down there, a big job." Carney's particular work was "stringing cable." The task was intended to last for some period of time; "this wasn't a temporary job". As the trial judge stated in his opinion: "Although defendant could have transferred plaintiff to Youngstown and required him to pay his own expenses it decided that plaintiff's station should remain at Pittsburgh and that it would pay plaintiff's living expenses while working on the project away from his station. Defendant made arrangements for plaintiff and his fellow linemen to stay at the Pittsburgh & Lake Erie Railroad Y.M.C.A. at Campbell, Ohio. Plaintiff and other members of his gang slept at the Y.M.C.A. during the work-week, ate two meals a day at its restaurant, and had their lunch packed by Y.M.C.A. employees. Although about 97%-98% of the men who used these facilities paid for them all charges for plaintiff's room and board were billed directly to and paid for by defendant on a monthly basis. At oral argument on its motion, defendant conceded that it would not have paid for or reimbursed plaintiff for his living expenses unless he stayed at the Y.M.C.A. Plaintiff's daily working hours were from 8:00 A.M. to 4:30 P.M. and he was not 'on call' at other times."

The situation regarding the Y.M.C.A. and its relationship to the railroad need not be detailed. Regarding this the district court stated "Under these circumstances it cannot be disputed that defendant had some measure of control over the operation and maintenance of Y.M.C.A. facilities, whether or not it chose to exercise it." There is a lot to be said for this position but we prefer to base our decision primarily upon the proposition that plaintiff's residence and lodging at the Y.M.C.A. was part of the operational activities of the railroad; that the Y.M.C.A. in supplying those services to plaintiff by arrangement with the railroad, was performing operational activities of plaintiff's employer and in that capacity was an agent for the employer in accordance with Section 1 of the Employers' Liability Act. (45 U.S.C.A. § 51). Carney, when he fell, was in his room at the Y.M.C.A. where he was staying. He was there under the specific agreement with his employer that he would retain his out of town status and that the railroad would pay for his living expenses. As we have seen under the settled Mostyn, Casso principle, Carney was in the course of his employment when he was hurt. And under Sinkler v. Missouri Pacific R. R., 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958) the negligence of the Y.M. C.A. (found by the jury responsible in whole or part for the accident) was the negligence of its principal, the defendant

---

2. E. g., Atlantic Coast Line R. R. v. Smalls, 216 F.2d 842 (4 Cir., 1954); Lukon v. Pennsylvania R. R., 131 F.2d 327 (3 Cir., 1942); Virginian R. R. v. Early, 130 F.2d 548 (4 Cir., 1942); Atlantic Coast Line R. R. v. Meeks, 30 Tenn.App. 520, 208 S.W.2d 355 (1947).

railroad. In Sinkler the plaintiff was an employee of the defendant Missouri Pacific Railroad. He was working on one of the latter's cars while it was being switched by a crew of the Belt Railway in the Union Station at Houston, Texas. The car collided with another car in the station through the fault of the switching crew and plaintiff was injured. The switching railroad was organized by the Missouri Pacific and other rail carriers running into Union Station. They owned the Railway's stock and were represented on the Board of Directors in proportion to their holdings. Missouri Pacific owned half the stock and designated one-half of the directors. The Railway received some income from non stockholding carriers but the carrier stockholders otherwise shared the net expense of its operations according to an agreed formula. The Railway employed its own switching crews and other personnel and owned and operated the facilities and rolling stock used in the switching operations. The Supreme Court held, 356 U.S. 331–332, 78 S.Ct. 762–763:

> "In the present case the respondent, rather than doing the necessary switching incident to its business in the Houston Terminal area, arranged that the Belt Railway should supply the crews and equipment to perform this operation on its behalf. But the evidence clearly establishes that the respondent's trains, when under the control of the Belt Railway's switching crews, were being handled to further the task of the respondent's enterprise. While engaged in switching and handling respondent's cars and trains about the terminal area, the Belt Railway employees on the job were, for purposes of the FELA, as much a part of the respondent's total enterprise as was the petitioner while engaged in his regular work on the respondent's car.

> "It is manifest that the corporate autonomy of the Belt Railway, and its freedom from detailed supervision of its operations by respondent are irrelevant inasmuch as the switching crew of the Belt Railway Company at the moment of the collision in the station was engaged in furthering the operational activities of respondent. We therefore hold that when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer within the meaning of § 1 of FELA."

Ward v. Atlantic Coast Line R. Co., 362 U.S. 396, 80 S.Ct. 789, 4 L.Ed.2d 820 (1960) reaffirmed the Sinkler doctrine. There the plaintiff was employed by the railroad as a laborer in a section gang with a regular work week from Monday through Friday. On a Saturday, his day off, he with others of his gang worked for a customer of the railroad, a private concern, repairing the railroad siding into its property. The customer was bound to make the repairs at its own expense under its agreement with the railroad. Through the gang foreman, it hired the gang at overtime wages which the foreman paid the men with funds supplied him by the customer. Plaintiff was hurt during the work. The Supreme Court held pages 397, 398, 80 S.Ct. 790, 791:

> "This was not a situation, as in Sinkler, in which the railroad engaged an independent contractor to perform operational activities required to carry out the franchise. This was a siding privately owned by the Turpentine Company and established to service it alone. In maintaining it, we do not see how it can be said under the proofs that the Turpentine Company was 'engaged in furthering the operational activities of respondent.'"

Baker v. Texas & P. R. Co., 359 U.S. 227, 229, 79 S.Ct. 664, 665, 3 L.Ed.2d 756 (1959) indicates strongly that in the kind of situation before us where the employment relationship at the time of the accident was controverted "An issue for determination by the jury was presented. 'The very essence of * * * [the jury's] function is to select from

among conflicting inferences and conclusions that which it considers most reasonable.' Tennant v. Peoria & Pekin Union R. Co., 321 U.S. 29, 35 [64 S.Ct. 409, 88 L.Ed. 520]."

Leek v. B. & O. R. Co., 200 F.Supp. 368 (N.D.W.Va. 1962) is the latest reported decision we have found which follows Sinkler. It presents a close factual parallel to this appeal. Employees of the B. & O. railroad, after completion of their day's work as a switching crew were being transported in a taxicab from where they had been employed to the railroad yard twelve miles away. That transportation was part of a shuttle arrangement between the railroad and the cab company for which the latter was paid by the railroad on a monthly arrangement. During the trip the taxicab went off the road, struck a pole and overturned. Plaintiff was injured. The accident occurred through the fault of the cab driver. Regarding the operational activity point involved the court held pages 370, 371:

"Certainly, there must be many services performed by others under contract with a railroad, which are incidental or even necessary to the corporate purposes of the railroad, which are not 'operational activities' within the meaning of those words as employed in the Sinkler case. Just where the line should be drawn, I am neither prepared nor called upon to specify. However, I do not believe that the line should be drawn short of the activities which the taxicab company was performing for the railroad in this case.

\*　　\*　　\*　　\*　　\*　　\*

"The obligation of the railroad to its employees created by the F.E.L.A. is imposed (in the words of the opinion in the Sinkler case), 'not because the employer is himself to blame, but because justice demands that one who gives his labor to the furtherance of the enterprise should be assured that all combining their exertions with him in the common pursuit will conduct themselves in all respects with sufficient care that his safety while doing his part will not be endangered.' One may quarrel with the congressional policy, as found and determined by the Supreme Court, in shifting the burden of economic loss caused, in whole or in part, by the negligence of someone acting in furtherance of the railroad's enterprise, from the individual to the enterprise, but the trend of the Court's decisions is too clear for this district court to disregard it." [3]

What we have here is that the lodging of Carney at the railroad Y.M.C.A. was an integral part of the Pittsburgh & Lake Erie's particular and important project in the vicinity. By that means the railroad made sure that Carney was on location and readily available during the period of the Campbell undertaking. The railroad handled Carney's board and lodging through the Y.M.C.A. "\* \* \* to further the task of [its] enterprise." And it was just as much a part of that enterprise as when Carney was actually stringing cable, for it put him in Campbell and kept him there to do that phase of the work. What he did was no separate engagement of the Y.M.C.A. as was the situation regarding the Turpentine Com-

3. Mazzucola v. Pennsylvania Railroad Company, 281 F.2d 267 (3 Cir., 1960) in no way attempts to restrict the principle formulated from the above quoted decisions. On the phase of it in which we are interested it merely holds that under its particular facts p. 270 "\* \* \* summary judgment is inappropriate." Here, the factual situation was fully developed at the trial. Garrett v. Southern Railway, 173 F.Supp. 915 (E.D.Tenn. 1959), aff'd. 278 F.2d 424 (6 Cir., 1960), cert. den. 364 U.S. 833, 81 S.Ct. 49, 5 L.

Ed.2d 59 (1960) was a control case in which the trial court concluded from the facts p. 920 "\* \* \* that the control of Southern over Lenoir was not such as to constitute the latter an adjunct of Southern." As the Sixth Circuit pointed out in Cimorelli v. New York Central R. Co., 148 F.2d 575, 577 (6 Cir., 1945), regarding this type of litigation, "Each case must be decided on its peculiar facts and ordinarily no one feature of the relationship is determinative."

pany in *Ward, supra.* In this instance it was solely Pittsburgh & Lake Erie construction, alterations or repairs which were involved and for which his employer wanted Carney to be and remain at the scene. That objective under the facts was fully as much a part of the Campbell project as was the transportation of employees to and from their job in Leek, *supra.*

Even under common law there is substantial authority, as the Supreme Court states in Sinkler, *supra* at 329, 78 S. Ct. at 761, which " * * * supported recovery by the railroad employee from his employer for injuries caused by the fault of employees of an independent contractor performing a part of the employer's railroad operations." But as that opinion firmly holds there is no need of relying on those principles where, as in this suit, we are governed by the F.E.L.A. whose " * * * broad purpose controls our decision in determining whether the Belt Railway and its switching crew were 'agents' of the respondent within the meaning of the section. Plainly an accommodating scope must be given to the word 'agents' to give vitality to the standard governing the liability of carriers to their workers injured on the job." Pp. 330, 331, 78 S.Ct. p. 762.

From all of the above, in our view, the service the Y.M.C.A. performed for the railroad in taking care of Carney was part of the Pittsburgh & Lake Erie's operational activities and therefore the Y. M.C.A. is to be treated in this instance as the agent of the railroad within the meaning of the F.E.L.A.

Appellant also contends that the release given by plaintiff to defendant is a bar to his action. There is no need of discussing this point at any length. We agree completely with the district court that the document did not apply to the injuries sustained in the accident of May 3, 1957 (the one before us) and that plaintiff's acceptance of further medical treatment for his earlier hernial condition after he had executed said release did not ratify it so as to include within it the accident before us.

The judgment of the district court will be affirmed.

HASTIE, Circuit Judge (dissenting).

Essential to the majority decision is the conclusion that a Young Men's Christian Association, in furnishing lodging to employees of the defendant railroad, acted as an "agent" of the railroad within the meaning of section 1 of the F.E.L.A.[1] Otherwise, the railroad could not be held liable for negligence of the Y.M.C.A. in improperly making up the bed from which plaintiff fell in his sleep.[2] I am unable to agree that the Y.M.C.A. was the railroad's "agent", as that term is used in the controlling statute.

The leading case is Sinkler v. Missouri Pacific R. R. Co., 1958, 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799, rehearing denied, 356 U.S. 978, 78 S.Ct. 1133, 2 L.Ed. 2d 1152. There the Supreme Court held that section 1 of the F.E.L.A. has created a statutory conception of agency broad enough to include "others performing, under contract, operational activities" of the railroad. 356 U.S. at 331, 78 S.Ct. at 762. The key phrase is "operational activities". The Court viewed the statute as "a response to the special needs of railroad workers who are daily exposed to the risks inherent in railroad work and are helpless to provide adequately for their own safety." 356 U.S. at 329, 78 S.Ct. at 761. The phrase "operational activities" seems to have been used by the Court to describe the area within which these

---

1. The section reads, in relevant part, as follows:
  "Every * * * railroad while engaging in commerce * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce * * * for such injury * * * resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier * * *." 45 U.S.C. § 51.

2. The trouble seems to have been that a broad mattress, inappropriately placed on top of a narrow mattress, tilted when the occupant turned in his sleep.

characteristic "risks inherent in railroad work" are experienced. Under this rationale, the switching of the defendant's car at a railroad station, which the negligent third person was performing in the Sinkler case, was obviously an "operational activity" of the defendant's railroading. By the same token, the providing of sleeping accommodations for off-duty railroad men seems to be the type of collateral activity which may facilitate railroading but is not "operational" in character.

This has been made clearer by the more precise articulation in Ward v. Atlantic Coast Line R. R. Co., 1960, 362 U.S. 396, 80 S.Ct. 789, 4 L.Ed.2d 820, where a third person maintaining a privately owned siding was held not to be engaged in an "operational activity" of the railroad and, hence, not to be an agent of the railroad within the meaning of the statute. In Ward, the Court added significant words to the key phrase, limiting the special agency concept to independent contractors performing "operational activities required to carry out the franchise" of the railroad. 362 U.S. at 397, 80 S.Ct. at 790. Actually, this very phrase was used by Mr. Justice Brennan in Sinkler to describe a common-law extension of vicarious liability which exists in some jurisdictions. It is evident from the illustrative cases cited therein that the Court understood that extension as being limited to the actual movement of cars and freight and maintenance of operating equipment.[3] The language used in Ward makes explicit that the Sinkler doctrine is no broader than this limited common-law extension of respondeat superior. We recognized the restrictive effect of the

Ward case in Mazzucola v. Pennsylvania R. R. Co., 3d Cir.,1960, 281 F.2d 267, 270 n. 4. Accord, Garrett v. Southern Ry. Co., E.D.Tenn.1959, 173 F.Supp. 915, 918–919, aff'd, 6th Cir.,1960, 278 F.2d 424, cert. denied, 364 U.S. 833, 81 S.Ct. 49, 5 L.Ed.2d 59. Any contrary intimation in Leek v. Baltimore & O. R. R. Co., N.D. W.Va.1962, 200 F.Supp. 368, upon which the majority rely, is, in my judgment, unwarranted. I can find no rationale under which the Y.M.C.A. supplying hotel accommodations can be brought within the conception of a contractor performing an "operational activity" of the railroad, "required to carry out the franchise".

The majority opinion lays some stress upon the character of the injured employee's activity and the fact that the railroad paid the cost of the employee's lodging. But it is the negligent third person who must have been performing an operational activity of the carrier in order to impose liability on the railroad. The nature of the injured workman's activity and the railroad's willingness to pay for his overnight accommodations both go to an entirely separate problem: whether, within the meaning of the F.E.L.A., the workman was "employed" at the time of his injury.

Apart from concepts peculiar to the F.E.L.A., I think it clear that the so-called "railroad" Y.M.C.A. was not a common-law agent of the defendant railroad. They were separate corporations performing distinct functions. This "Y" was one of more that 100 similar units organized in various parts of the country by the national Y.M.C.A. to provide lodging and recreational, religious and educational activities for railroad workers

3. The cases cited by the Court may be classified as follows:
SWITCHING OPERATIONS: Floody v. Great Northern Ry. Co., 1907, 102 Minn. 81, 112 N.W. 875, 13 L.R.A.,N.S., 1196, reargument denied, 102 Minn. 81, 112 N.W. 1081, 13 L.R.A.,N.S., 1196; Gulf, C. & S. F. Ry. Co. v. Shelton, 1903, 96 Tex. 301, 72 S.W. 165; Fort Worth & D. C. Ry. Co. v. Smith, 1905, 39 Tex.Civ.App. 92, 87 S.W. 371.
MAINTENANCE OF TRACK OR ROLLING STOCK: North Chicago St. Ry. Co. v.

Dudgeon, 1900, 184 Ill. 477, 56 N.E. 796; Wabash, St. L. & P. R. R. Co. v. Peyton, 1883, 106 Ill. 534, 46 Am.Rep. 705; Story v. Concord & M. R. R., 1900, 70 N.H. 364, 48 A. 288; Gulf, C. & S. F. Ry. Co. v. Shearer, 1892, 1 Tex.Civ.App. 343, 21 S.W. 133.
TRANSFERRING FREIGHT FROM ONE CAR TO ANOTHER: Burns v. Kansas City, Ft. S. & M. Ry. Co., 1895, 129 Mo. 41, 31 S.W. 347.

away from home. The railroad had no authority over the Y.M.C.A. It did not select or appoint the directors or the employees of the Y.M.C.A. It did not supervise or interfere with "Y" activities. True, since the Y.M.C.A. served railroad men primarily, the local "Y" directors were railroad employees. But they were not policy making officers of the railroad and there is no indication whatever that the railroad influenced their decisions as Y.M.C.A. board members in any way.

The only other connection of the railroad with the Y.M.C.A. took the form of substantial donations of money and facilities. But a large donor to such a benevolent organization as a Y.M.C.A. is not for that reason related to the donee as a principal is to an agent. Here again there is no evidence that the railroad used its position as a donor as a means of exercising any control over the Y.M.C.A.

For these reasons I think this court and the court below have erred in holding the railroad responsible for the way in which the Y.M.C.A. made up its beds. The railroad was entitled to judgment n. o. v. in accordance with its appropriate motion at the conclusion of the trial.