384 F.2d 267
 Harry C. ZUBIK and Lorraine F. Zubik, His Wife, and Harry
Zubik Company, Inc. (Appellees in No. 15940), Lawrence W.
Beaver (Appellee in No. 15941), James H. Haley (Appellee in
No. 15942), Charles Thornton (Appellee in No. 15943), Elmer
P. Grimm (Appellee in Nos. 15944 Through 15948),
v.
Charles ZUBIK, Jr. and Virginia Zubik Drambel, Executors of
the Estate ofCharles Zubik, Sr., and Charles Zubik
& Sons, Inc. (Appellants in Nos.
15940Through 15948).
Burton E. SQUIRES
v.
CHARLES ZUBIK & SONS, INC., Appellant.
Petition of CHARLES ZUBIK & SONS, INC., for Exoneration from
Liability orLimitation of Liability Charles Zubik
& Sons, Inc., Appellant.
Petition of Charles ZUBIK, Individually, for Exoneration
from or Limitation ofLiability Charles Zubik, Jr.
and Virginia Zubik Drambel, Executors of
theEstate of Charles Zubik,
Sr., Appellants.
 Nos. 15940-15951.
 United States Court of Appeals Third Circuit.
 Argued June 20, 1967.
Decided Sept. 29, 1967, Rehearing Denied Nov. 6, 1967.
 
 1
 John D. Ray, Beaver, Pa., and Benjamin F. Stahl, Philadelphia, Pa. (Walter V. McLaughlin, Jr., Philadelphia, Pa., Ray & Good, Beaver, Pa., Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., on the brief), for appellants.
 
 
 2
 Douglas A. Jacobsen, New York City, and Norman J. Cowie, Pittsbrugh, Pa. (Pringle, Bredin, Thomson, Rhodes & Grigsby, Pittsburgh, Pa., Bigham, Englar, Jones & Houston, New York City, McArdle & McLaughlin, James R. Fitzgerald, Pittsburgh, Pa., on the brief), for appellees.
 
 
 3
 Before KALODNER and HASTIE, Circuit Judges, and VAN DUSEN, District judge.
 
 OPINION OF THE COURT
 
 4
 VAN DUSEN, District Judge.*
 
 
 5
 This consolidated appeal is from multiple judgments in admiralty entered in the District Court against Charles Zubik (Charles, Sr.), individually,*0 and Charles Zubik & Sons, Inc. (Zubik Corporation). The claimed damages to personal property and equipment occurred early on the morning of March 6, 1964, when an unusually large ice flow coming down the Allegheny River broke several of the appellants' sand and gravel barges from their moorings at the 16th Street landing in the City of Pittsburgh. The drifting vessels caused damage to the several appellees having a total value of $207,540.
 
 
 6
 Appellants make three arguments: that the wrong test of negligence was used by the trial judge; that, even if the Zubik Corporation was liable, the court erred in disregarding the corporate entity and treating Charles, Sr. and Zubik Corporation as one and the same; and that, even if the Zubik Corporation was liable, the original individual respondent, Charles, Sr., was not personally liable for negligence in his own acts.
 
 I.
 
 7
 On the issue of the liability of Zubik Corporation, there is sufficient evidence to support the conclusion of the trial judge that the appellant did not sustain its 'heavy' burden of proof. As the leading case in this Circuit sets forth, Swenson v. The Argonaut, 204 F.2d 636 (3rd Cir. 1953), when a collision involves a vessel drifting loose from its moorings, the respondent must overcome a presumption of fault. And if the defense, as in this case, is 'inevitable accident' or vis major, the respondent's burden includes proving freedom from negligence or inevitable circumstances unalterable by human effort, precaution, or proper nautical skill. The Louisiana, 3 Wall. 164, 18 L.Ed. 85 (1866); Swenson v. The Argonaut, supra, 204 F.2d at 640. The record shows such sufficient evidence of warning of the ice flow, time to act to move some or all of the barges to safe waters, improper fastenings of some lines, and improper positioning of the fleet of barges that we cannot find the judgment below 'clearly erroneous' or the result of a 'mistake.' McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Knox v. United States Lines Company, 320 F.2d 247, 249 (3rd Cir. 1963). We therefore affirm the trial court's finding of negligence as to Zubik Corporation (Conclusions of Law Nos. 2, 5 & 11).
 
 II.
 
 8
 The issue of Charles Zubik, Sr.'s personal liability occupied a large part of the trial below. The trial judge's several findings of fact concerning the interrelation of Charles, Sr.'s personal affairs and the affairs of Zubik Corporation led him to the conclusion that:
 
 
 9
 'The corporate defendant is nothing more than the alter ego of the individual defendant. * * * All of the defendant's finances, activities, operation of the corporation business were intertwined with that of the corporation. The overwhelming weight of the evidence indicates that there is no demarcation between the individual and corporate defendants.' (1155-39a)
 
 
 10
 This conclusion of 'lack of demarcation' or conclusion that the corporation was the 'alter ego' of Charles, Sr. rested upon Findings of Fact concerning the Zubik business operation. In these Findings the trial judge stressed that Zubik Corporation was 'purely an operating company' with records inadequate even to designate what property owned by Charles, Sr. was leased to the corporation and at what rent. The intertwining of Charles, Sr.'s personal affairs with the corporation was inferred, particularly from the fact that all of his personal expenses were paid directly by the corporation with merely a bookkeeping entry against Charles, Sr.'s credit account. Emphasis was placed upon the fact that Charles, Sr. was the only one authorized to sign corporate checks, although, via a personal power of attorney, his daughter often signed for him. A disregard of the corporate formalities of meetings for some years, the use of oral leases of equipment from Charles, Sr. at fluctuating rentals, and the general 'intertwining' of personal and corporate finances, relating to the sale of barges and the borrowing of money, provided additional 'facts' from which the trial judge concluded that the corporate 'fiction' of Zubik Corporation could not be relied upon by Charles, Sr.[1]
 
 
 11
 Consideration of the record as a whole, however, requires the conclusion that libellants did not sustain their burden of proving that the corporate entity should be disregarded.[2] An examination of the record has established that the additional facts summarized below are supported by uncontradicted evidence. Zubik Corporation was formed in 1948 on the advice of counsel when Charles, Sr. became too ill to continue physically in his business and when he wanted to let his children run the business he had created. Engaged primarily in the sand and gravel business, after 1957 the corporation expanded into the related field of producing concrete. In both businesses, the corporation paid its own expenses of operation, hired its own employees, paid their wages and made the various tax, social security, and unemployment payments. Although the corporation borrowed from Charles, Sr. on several occasions it borrowed from other stockholders as well. The corporation kept records reflecting such loans.
 
 
 12
 Considerable testimony was heard concerning the leasing of barges and other assets owned by Charles, Sr. Although the bulk of the equipment used by Zubik Corporation was leased from Charles, Sr., some barges were leased from others and the corporation owned some assets of its own (over $67,000. one witness testified) such as cement, gravel, sand, gasoline, tools and rope.[3] The great bulk of the 'assets,' however, were owned by Charles, Sr., including those used in the cement business, and leased in their entirety to Zubik Corporation. Charles, Sr. owned very little he did not lease. Some controversy existed over the financial arrangement of such leases from Charles, Sr.; however, all sides seem to agree that payments to Charles, Sr., including his salary, took the form of credits to his account with the company. Whether these payments and leases are characterized as 'purported' or not (see appellees' brief, p. 26, Nos. 7, 11), Charles, Sr.'s credit account was carefully debited to reflect payment of all of Charles, Sr.'s personal expenses. In this fashion, Charles, Sr. was 'paid' his salary, rental and loans, by having the corporation 'pay' for his personal expenses. All of the evidence concerning the written and oral leases, as well as the bookkeeping and activities concerning sale, purchase, sub-letting, repairs, and maintenance of equipment, tended to show a possible lack of arm's-length dealing between Charles, Sr. and the corporation or a lack of some of the formal elements of a lessor-lessee relationship found outside a closely-held corporation.[4] This informality extended to the observance of corporate procedure as to meetings (no records for 1961 through 1963) and as to expenses, oral renewals of leases, and alteration of rentals and salaries to reflect the success of operations. But there is no evidence that funds oscillated at will between Charles, Sr. and Zubik Corporation,[5] and the Internal Revenue Service apparently forced some uniformity, at least as to fair and consistent rentals.
 
 
 13
 Since the trial judge did not disbelieve or reject the testimony concerning oral leases of marine equipment,[6] it is difficult to understand his Conclusion of Law 8 that the barges which broke away 'were not under lease' to Zubik Corporation 'at the time of the breakaway.' (1155-46a).
 
 
 14
 The Zubik family paid attention to the separate corporate entity of the closelyheld Zubik family corporation in many respects. It was particularly required for tax purposes.[7] Members of the family were given shares of stock by their father[8] which he paid for in cash. The children served as officers of the corporation and also as its 'active heads'. In addition to the uncontradicted evidence of regular meetings of Zubik Corporation in years prior to 1961 and in 1964, there is testimony of corporate meetings during the years 1961-1963, even though no minutes were produced. Moreover, the separate corporate existence cannot be denied merely because Charles, Sr. and the corporation had the same attorney or the same accountant. The fact that Charles, Sr.'s records and the corporate records were both kept by his daughter, the fact that the corporation kept his notes and deeds, or the fact that his daughter signed corporate checks pursuant to a personal power of attorney from Charles, Sr. seems irrelevant to the issue of separate corporate existence, particularly since Charles, Sr. could neither read nor write. Even if Charles, Sr. remained the 'last word' within the corporation, his sons ran the business, asking their father only for his experienced advice. As to daily operations, Charles, Sr. was really a spectator, whether from the upper deck of their office boat or from his car on the river road. The fact that Charles, Sr. kept all his personal money in the corporation, Finding of Fact 4, seems adequately explained by the testimony that he sought to avoid government attachment, and that the corporation made money in only one year and, thereofre, not only declared no dividends but was forced to 'juggle the best way we know how to try to get along' (192a).[9]
 
 
 15
 Since business on the river was apparently filled with the constant threat of litigation, over collisions for instance (e.g. Charles Zubik & Sons, Inc. v. Ohio River Company, 208 F.Supp. 71 (W.D.Pa.1962)) or even over real estate, it was natural in 1948 for a sick man, no longer able to play an active role in the business, to seek to limit his personal liability.[10]
 
 
 16
 As all parties to this appeal agree, the appropriate occasion for disregarding the corporate existence occurs when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime. Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 618, 59 S.Ct. 543, 83 L.Ed. 669 (1939); Anderson v. Abbott, 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793 (1944); United States v. Goldberg, 206 F.Supp. 394, 405 (E.D.Pa.1962), aff'd on other grounds, 330 F.2d 30 (3rd Cir. 1963), cert. den. 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964); Tucker v. Binenstock, 310 Pa. 254, 263, 165 A. 247 (1933). There is no doubt that an admiralty court has as part of its general jurisdiction sufficient equitable powers to apply this test, Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), however 'unclear or unsettled' its operation may be in Pennsylvania or the country at large. Barium Steel Corp. v. Wiley, 379 Pa. 38, 47, 108 A.2d 336 (1954).
 
 
 17
 In applying the test, however, any court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception. E.g., Erie Drug Company Case, 416 Pa. 41, 43, 204 A.2d 256 (1964). Care should be taken on all occasions to avoid making 'the entire theory of the corporate entity * * * useless.' Price Bar, Inc., Liquor License Case, 203 Pa.Super. 481, 484, 201 A.2d 221, 222 (1964); Gagnon v. Speback, 389 Pa. 17, 21, 131 A.2d 619 (1957); cf. Miller v. Bethlehem Steel Corporation, 189 F.Supp. 916, 917 (S.D.W.Va.1960). Cases in bankruptcy[11] or in taxation[12] call for an entirely different evaluation of 'fraud' or 'injustice' than cases of controlled corporate subsidiaries,[13] or as in this instance, a case of corporate tort.[14] The defrauded creditor or 'victim' of a business transaction with an undercapitalized corporation, for instance, often has a strong case for piercing the veil of a 'sham' corporation. See 63 A.L.R.2d 1051. The controversy in such cases invariably involves some degree of reliance by the plaintiff, contributing to the fraud, or undue advantage or trick accenting the injustice. But the injured tort claimant stands on a different footing. It is not contended that the claimants here relied upon Zubik Corporation's being more than a 'mere operating company.'
 
 
 18
 Limiting one's personal liability is a traditional reason for a corporation. Unless done deliberately, with specific intent to escape liability for a specific tort or class of torts, the cause of justice does not require disregarding the corporate entity.[15] The corporate form itself works no fraud on a person harmed in an accident who has never elected to deal with the corporation.
 
 
 19
 Once fraud or injustice demand piercing the corporate veil, then the intertwining of personal affairs with a family corporation can provide additional grounds for arguing that the defendant cannot be heard to complain. In such cases, the failure of various corporate formalities either contributes to the fraud involved or strengthens the argument for injustice by holding the individual in effect estopped. But in the case of an old (71 at the time of trial), illiterate, ill man, the conduct of personal affairs through a family corporation not only has its separate justification unrelated to fraud or injustice but it fails as a 'make weight' agrement for ignoring the corporate entity.[16] Nothing in the record indicates that an 'operating company' such as Zubik Corporation was unique, or that it perpetrated a fraud on the Pittsburgh river community.[17] Neither does it justify a finding that the liabellants in this case were defrauded in any respect by lack of corporate formalities of Zubik Corporation or the fact that it paid Charles, Sr. by debiting his account, rather than drawing a regular salary check to his order. Nowhere does it appear that anyone failed to insure or felt protected in reliance upon Zubik Corporation's assets.
 
 
 20
 This record does not justify holding Charles Zubik, Sr. individually liable by disregarding the corporate existence of Zubik Corporation.
 
 III.
 
 21
 The trial judge also found Charles, Sr. individually liable, apparently finding that he participated sufficiently in the negligent acts (Conclusions of Law 2, 4 and 5) to be responsible for this accident. Such participation in negligent acts, or privity to or knowledge of negligent acts, was supported by Findings of Fact 12 and 13 and the trial judge's conclusion that the corporation was merely the 'alter ego' of Charles, Sr. with 'direct privity' existing between all employees and officers in the maintenance and control of the vessels and marine equipment. Since we find that the corporation had a separate existence, Charles, Sr.'s individual liability must rest upon the two Findings of Fact: that he was personally at the landing 'shortly before' the fleet broke loose and that, throughout the period preceding the accident, he was always within the 'immediate area' of the barges.[18]
 
 
 22
 These two Findings by the trial judge do not, as a matter of law, allow a conclusion that Charles, Sr. was individually liable for the negligence and the record does not justify a finding that Charles, Sr. either participated sufficiently in the negligent acts themselves or neglected some duty of supervision over the officers and employees of the corporation who brought about the harm.
 
 
 23
 Charles, Sr. was an old (71) man, ill in health, and unable to participate physically in river work. During the time preceding the breakaway, he was in his office boat, downstream from the landing where the barges were moored. During those days he sat and talked to his sons, advising them on the basis of his past experience. The closest he came to participation was to look at the barge fleet from his automobile or office boat; he had nothing to do personally with tying up the fleet. Rather, he 'talked' to his sons, Charles, Jr. and Donald, and to other employees, saying 'what if anything can be done, that is what we are going to try'; these others did all the negligent mooring. Although Charles, Sr. had some information concerning the impending ice flow, all he could do physically was pass it on to the others, and give advice. The night of the breakaway Charles, Sr. apparently visited the landing, observing as usual from his car. That night he left his car only because it became stuck on some railroad tracks. No testimony reveals what Charles, Sr. could have observed at that time of night (approximately 3 A.M.) as to the condition of the barges or their mooring.[19] The extent of his participation was to ask an experienced employee if everything was all right.
 
 
 24
 The employees and officers who assumed responsibility for the actual mooring were all experienced.[20] Charles, Jr. and Donald Zubik were also acting with a personal interest in protecting the property of their family corporation. The agents of the corporation on whom Charles, Sr. relied were competent. See Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943); Briggs v. Spaulding, 141 U.S. 132, 147, 11 S.Ct. 924, 35 L.Ed. 662 (1891).
 
 
 25
 Libellants have not sustained their burden of proving Charles, Sr.'s personal participation in the negligent acts, which is crucial on this record:
 
 
 26
 'The general, if not universla, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable thereofr; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specificially directed the particular act to be done, or participated, or cooperated therein.' 3 Fletcher Cyc. Corp. 1137 (pp. 782-3) (Perm. Ed. Rev. 1965).
 
 
 27
 19 C.J.S. Corporations 845, pp. 271-273; see Chester-Cambridge B. & T. Co. v. Rhodes, 346 Pa. 427, 433, 31 A.2d 128 (1943). The trial judge's only two relevant Findings of Fact on this issue merely state that Charles, Sr. 'visited' the landing shortly before the fleet of barges broke loose, and that he was 'within the immediate area' of the accident (115542a).[21] Such does not constitute participation sufficient to charge Charles, Sr. with the negligence of agents of Zubik Corporation. This record, insofar as it covers the point, shows that Charles, Sr. fully discharged whatever duty he had to advise the 'active heads' of the corporation and that his acts of observation and 'instruction' to his sons and others did not constitute participation by an old and infirm riverman in the negligent mooring of the barges or in the misfeasance of not moving them in time to safer waters.
 
 
 28
 Furthermore, in view of the foregoing conclusion that the corporate entity cannot be treated as the 'alter ego' or mere instrumentality of Charles, Sr., we also cannot agree that Charles, Sr. is individually liable for the accident by imputing to him the acts and knowledge of the various corporate agents who did participate.[22]
 
 
 29
 For the foregoing reasons, we will affirm the District Court in Nos. 15940 through 15949 as to the judgments entered against Charles Zubik & Sons, Inc. (Nos. 64-35, 64-39, 64-40, 64-41, 64-42, 64-45, 64-46, 64-47, 64-48, 64-49, all in Admiralty in the United States District Court for the Western District of Pennsylvania). Those judgments will be reversed insofar as they are entered against Charles Zubik, Sr. individually.[23] The denial of the petition of Charles Zubik & Sons, Inc. for exoneration from or limitation of liability (No. 64-50 in Admiralty), appealed in No. 15950, will be affirmed. The appeal (No. 15951) from the denial of the petition of Charles Zubik, Sr., individually, for exoneration from or limitation of liability (No. 64-51 in Admiralty) will be dismissed as moot,[24] in view of our reversal of the judgments entered against him individually.
 
 
 
 *
 Subsequent to the oral argument, Judge Van Dusen was appointed a judge of the United States Court of Appeals for the Third Circuit
 
 
 **
 The executors of the estate of the original individual respondent have been substituted for him in view of his death since the trial
 
 
 [1]
 Conclusion of Law 1 reads (1155-45a):
 'Charles Zubik is for all practical purposes, the real owner and operator of Charles Zubik & Sons, Inc., and has so intertwined, confused and joined his personal activities with that of his corporation that he is not entitled to rely upon the corporate fiction of Charles Zubik & Sons, Inc., and establish it as a separate entity so as not to be charged with its negligent acts.'
 
 
 [2]
 Plaintiffs have 'the burden of establishing, by a preponderance of the evidence, that the corporation was an artifice and a sham designed to execute illegitimate purposes in abuse of the corporate fiction and the immunity that it carries * * *.' Coryell v. Phipps, 128 F.2d 702, 704 (5th Cir. 1942) aff'd on other grounds, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943); In re Sheridan's Petition, 226 F.Supp. 136, 139 (S.D.N.Y.1964)
 
 
 [3]
 Apparently the Internal Revenue Service did not allow many of these items to be carried as assets for tax purposes or as inventory
 
 
 [4]
 It is noted that lack of formalities in a closely-held or family corporation has often not been found to have as much consequence as where such a closely-held corporation is not involved, e.g., Chambers v. Beaver-Advance Corp., 392 Pa. 481, 492, 140 A.2d 808 (1958); Sharon Herald Co. v. Granger, 97 F.Supp. 295, 301 (W.D.Pa.1951), aff'd on other grounds, 195 F.2d 890 (3rd Cir. 1952). In the context of an attempt by an outside party to pierce the corporate veil of such a closely-held corporation, the informalities are considered of little consequence, e.g., In re Sheridan's Petition, 226 F.Supp. 136, 139 (S.D.N.Y.1964); Hellenic Lines, Limited v. Winkler, 249 F.Supp. 771, 773, 776 (S.D.N.Y.1966). Statutory personal liability of certain officer-shareholders of close corporations, regardless of observance of corporate formalities, has been suggested. See Note, Should Shareholders Be Personally Liable For The Torts of Their Corporation, 76 Yale L.J. 1190, 1196 ff. (1967)
 
 
 [5]
 See Hellenic Lines, Limited v. Winkler, supra, n. 4, at 776
 
 
 [6]
 Conclusion of Law 9 (1155-46a) recognizes 'alleged oral lease(s).' Finding of Fact 1 (1155-40a) states that Charles, Sr. 'leased (equipment) to the company for a set sum per month.' Finding of Fact 2 states: 'Charles Zubik (Sr.) owned all of the marine equipment and the corporation was merely an operating company for such equipment which was leased by Charles Zubik (Sr.).'
 
 
 [7]
 The tax returns of Zubik Corporation were apparently often audited and the issue of rentals for marine equipment was eventually settled in the I.R.S. Appellate Division. Such problems with the I.R.S. caused the accountant and corporation to keep careful separation of Zubik Corporation and Charles, Sr.'s personal transactions and resulted in a requirement that the corporation maintain a fixed rental, unchangeable without Government approval
 
 
 [8]
 In 1948 Charles, Sr. owned 252 shares; by gift his eight children owned 31 shares each, or 248. From 1948 to 1964, Charles, Sr. was not even majority stockholder due to his further gift of 10 shares to his granddaughter. Early in 1964, some of the children returned their stock to the corporation's attorney, but the reason for this does not appear in the record
 
 
 [9]
 The towing business was apparently undergoing hard times in the years before this accident, in particular, business suffered after the 1959 flood
 
 
 [10]
 See infra, note 15
 
 
 [11]
 E.g., Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939); Mayo v. Pioneer Bank & Trust Company, 274 F.2d 320 (5th Cir., 1960), affirming, on petition for rehearing, 270 F.2d 823 (5th Cir. 1959)
 
 
 [12]
 E.g., New Colonial Ice Co. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348 (1934); Burnet v. Clark, 287 U.S. 410 (1932; United States v. Goldberg, 206 F.Supp. 394 (E.D.Pa.1962), aff'd on other grounds, 330 F.2d 30 (3rd Cir. 1963), cert. den. 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964)
 
 
 [13]
 E.g., Whayne v. Transportation Management Service, Inc., 252 F.Supp. 573 (E.D.Pa.1966); Miller v. Bethlehem Steel Corporation, 189 F.Supp. 916, 917 (S.W.W.Va.1960); Garrett v. Southern Railway Company, 173 F.Supp. 915 (E.D.Tenn.1959); Garden City Co v. Burden, 186 F.2d 651 (10th Cir. 1951); 50 A.L.R. 611; 7 A.L.R.3d 1343
 
 
 [14]
 Counsel have been unable to cite a case where the corporate entity was disregarded to make an individual liable for tort. As it was stated in Geller v. Transamerica Corporation, 53 F.Supp. 625, 631 (D.Del.1943): 'In the absence of extraordinary circumstances, a court will not disregard the corporate fiction and hold a stockholder liable for the torts of the corporation.'
 
 
 [15]
 'The organization of a corporation for the avowed purpose of avoiding personal responsibility does not of itself, however, justify disregard of the corporate entity.' 1 Fletcher Cyc. Corp., 41.2 (p. 181) (Perm.Ed.Rev.1965). See Mull v. Colt Co., 178 F.Supp. 720, 721 (S.D.N.Y.1959); In re Sheridan's Petition, 226 F.Supp. 136, 138-139 (S.D.N.Y.1964); Elenkrieg v. Siebrecht, 238 N.Y. 254, 144 N.E. 519, 34 A.L.R. 592 (1924); McMillan Welding & Machine Works v. General Towing Co., 247 F.Supp. 402, 405-406 (E.D.La.1965). Compare Mull v. Colt Co., 31 F.R.D. 154 (S.D.N.Y.1962), where allegations of deliberate fraud (not present in the findings of the trial judge) were found sufficient to state a cause of action for piercing the corporate veil
 
 
 [16]
 The Zubik Corporation not only had carried on a legitimate business for 16 years in the dredging and hauling of sand and gravel, it had expanded into the production of concrete as well. It was a going concern, hiring and firing employees, paying their bills. There is no problem here of a mere corporate shell, Shechter v. Shechter, 366 Pa. 30, 76 A.2d 753 (1950), or of a fraudulent conveyance. Gagnon v. Speback, 389 Pa. 17, 131 A.2d 619 (1957)
 
 
 [17]
 A person who travels on the river, like a person who travels on the highway, does not evaluate the financial responsibility or structure of each person who may collide with him. No evidence or testimony shows that the libellants in any way relied upon the existence or nonexistence of Zubik Corporation in their decision to be on the river or run the risks (insured or uninsured) of the river. Also, it is noted that Harry Zubik, who has almost half of the total judgment against Zubik Corporation, was a son of Charles, Sr., an owner of stock in Zubik Corporation, and a former employee and vice-president of the corporation. He knew how its business was conducted and testimony revealed that he too used a corporation to conduct his large business. Elmer P. Graimm, who has a substantial part of the rest of the judgment, worked for Charles, Sr. for 17 years and as an experienced fellow bargeman knew a great deal about other operators-- even their sales and purchases of equipment
 
 
 [18]
 We do not deal with the finding of 'privity' as a ground for denying Charles, Sr.'s petition for exoneration from and limitation of liability (No. 64-51 in Admiralty below). But such 'privity' cannot, without more, satisfy the libellants' burden of establishing Charles, Sr.'s individual liability for negligence. As noted below, note 24, the appeal (No. 15951) from the judgment denying Charles, Sr.'s petition for exoneration and limitation is moot in view of the reversal of the judgments entered against Charles, Sr. individually in the District Court
 
 
 [19]
 Apparently a flashlight was needed to see the ropes or lines and Charles, St. 'just looked' from the shore, without any light. No floodlights were turned on
 
 
 [20]
 Charles Zubik, Jr. had worked on the river for about 17 years, Donald Zubik for 15 or 18 years, and Russell Hammack for 15. Charles, Jr. and Donald Zubik, the active heads of the business, knew the barges and the perils of an ice flow
 
 
 [21]
 Findings of Fact 3 and 5 attribute certain knowledge to Charles, Sr., but add nothing to the question of Charles, Sr.'s participation. Conclusion of Law 2 seems unsupported by the evidence, since no testimony shows that Charles, Sr. participated in the 'stationing, mooring and securing of the barges' in 1964. Conclusion of Law 4 finds that Charles, Sr. 'permitted' an act which contributed to the accident. But there is nothing to indicate that his 'permission' had any effect one way or another on the inadequate mooring ro timberhead stress
 
 
 [22]
 See note 18, supra; this does not mean that we reverse the trial judge's finding of 'privity' to the extent that such finding may have veen grounds for denying Charles, Sr.'s petition for exoneration and limitation of liability. See, e.g., Coryell v. Phipps, 317 U.S. 406, 408, 63 S.Ct. 291, 87 L.Ed. 363 (1943), on the separability of this issue from the issue of liability in tort that may arise by disregarding a corporate entity
 
 
 [23]
 It is noted that the judgment entered April 12, 1966, against Charles, Sr. in favor of appellee Squires (No. 64-49 in Admiralty) was deleted by order of April 13, 1966
 
 
 [24]
 See note 18, supra. Since Charles, Sr. selected competent men to moor the corporation's barges and was not on notice as to the existence of any defect in the location, mooring ro cindition of these barges on this record, it would appear, but it is not necessary to decide, that his estate is entitled to at least the benefit of the limitation of liability provided for in 46 U.S.C. 183. See Coryell v. Phipps, note 2, supra