AAMCO AUTOMATIC TRANSMIS-
SIONS, INC.

v.

Harry M. TAYLOE et al.

Gordon G. PARO et al.

v.

AAMCO AUTOMATIC TRANS-
MISSIONS, INC.

Civ. A. Nos. 73–391 and 73–1615.

United States District Court,
E. D. Pennsylvania.

Nov. 29, 1973.

Martin H. Katz, Bridgeport, Pa., for Aamco.

Oliver C. Biddle, Ballard, Spahr, Andrews & Ingersoll, Richard L. Sherman, Philadelphia, Pa., for Tayloe & Paro.

## MEMORANDUM OPINION AND ORDER

VANARTSDALEN, District Judge.

On March 29, 1966, plaintiff, Aamco Automatic Transmissions, Inc., and defendant, Harry M. Tayloe, entered into a written franchise agreement pursuant to which defendant Tayloe was granted a license to operate an Aamco Automatic Transmission Repair Shop in Bailey Crossroads, Virginia. On February 22, 1973, plaintiff filed a complaint in the district court alleging breach of that franchise agreement by defendant Tayloe. The complaint also alleged two claims for relief against defendants Jimran Corporation (Jimran), Crossroads Transmissions, Inc. (Crossroads), and Edward R. Valencia (Valencia): (1) conspiracy with defendant Tayloe to violate the above franchise agreement and (2) intentional interference with contractual relations. On April 30, 1973, defendants Tayloe, Jimran, Crossroads and Valencia filed an answer to the complaint denying the allegations as to breach of contract, conspiracy and intentional interference with contractual relations, and asserting, as affirmative defenses, lack of subject matter jurisdiction and lack of personal jurisdiction over Jimran, Crossroads and Valencia. In the answer, defendant Tayloe filed an individual counterclaim against Aamco alleging wrongful termination of the franchise agreement and a class action counterclaim alleging violation by Aamco of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. In a separate suit, Gordon G. Paro, also an Aamco franchisee, instituted a similar class action against Aamco under Sections 1 and 2 of the Sherman Antitrust Act. On October 18, 1973, this court consolidated the class action counterclaim of defendant Tayloe in Civil Action 73–391 with the class action claim of plaintiff Paro in Civil Action 73–1615.

Over the course of these events, several motions and countermotions were filed in Aamco v. Tayloe, thus necessitating this decision. Although all of the motions discussed herein are pending in Aamco v. Tayloe, one motion is common to both cases, i. e., Aamco's motion to dismiss the antitrust class action for failure to state a claim upon which relief may be granted. In this opinion the

sufficiency of the antitrust claim is assessed in view of the counterclaim filed by defendant Tayloe in Aamco v. Tayloe. However, my ruling with respect to it is fully applicable and dispositive of the similar motion in Paro v. Aamco.

 1. *Defendant Tayloe's Motion for Leave to Amend the Individual Contract Counterclaim and the Class Action Antitrust Counterclaim.*

Although plaintiff has objected to defendant Tayloe's motion for leave to amend, these objections do not warrant deviation from the express mandate of Federal Rule 15(a) that "leave [to amend] shall be freely given when justice so requires" in light of the Supreme Court interpretation of that rule in Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). In that case, Mr. Justice Goldberg set forth the standard to be followed in the application of Rule 15(a).

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Id.* at 182, 83 S.Ct. at 230.

 In applying this standard to the facts of this case, the amendments are proper. The motion to amend was filed approximately one month after the filing of the answer (April 30, 1973–June 5, 1973). In the context of this case, it cannot be said that this constitutes undue delay. As this is defendant's initial request for an amendment, the case does not involve "repeated failure to cure deficiencies by amendments previously granted." In light of my ruling that the proposed amended counterclaims do establish a claim for relief, *infra,* it is obvious that the amendments are not futile. Finally, there is no evidence of undue prejudice to the opposing party by virtue of the allowance of this amendment. Since the individual contract counterclaim and the class action antitrust counterclaim were pleaded by defendant Tayloe in his original answer, plaintiff has had continual notice of these claims. Now, via this amendment, defendant seeks not to change the scope or substance of these claims or to add a new or different claim, but merely to further clarify the essential elements of these originally asserted counterclaims. Based on these facts, I am unable to foresee "undue prejudice" to the plaintiff by the allowance of this amendment.[1]

As this case is well within the purview of Rule 15(a), the motion to amend the individual and class action counterclaim will be granted.

 2. *Plaintiff's Motion to Dismiss the Individual Contract Counterclaim and the Class Action Antitrust Counterclaim of Defendant Tayloe.*

 In assessing any motion to dismiss for failure to state a claim upon which relief can be granted, Fed.R.Civ. P. 12(b)(6), the court must begin with the well-settled principle established in Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that:

> a complaint should not be dismissed for failure to state a claim unless it appears *beyond doubt* that the plaintiff can prove *no set of facts* in sup-

---

1. Plaintiff has also asserted noncompliance with Local Rule of Civil Procedure 36 as a basis for denial of this motion. Granted defendant did not comply with the Rule as the motion to amend was filed without the required five-day notice, certification of service, or memorandum of supporting law. However, plaintiff did receive notice of the motion thereafter and filed a response in less than a week (June 11, 1973). More importantly, there is no indication that plaintiff's position with respect to this issue has been prejudiced by the nonconcurrent filing of his response, and to now require literal compliance would merely further delay determination of the issues.

port of his claim which would entitle him to relief.

*Id.* at 45–46, 78 S.Ct. at 102. (emphasis added). Supchak v. United States, 365 F.2d 844, 845 (3rd Cir. 1966); Melo-Sonics Corporation v. Cropp, 342 F.2d 856, 858–859 (3rd Cir. 1965); Hughes v. Local No. 11 of International Assn. of Bridge, Structural & Ornamental Ironworkers, 287 F.2d 810, 814 (3rd Cir.), cert. denied, 368 U.S. 829, 82 S.Ct. 51, 7 L.Ed.2d 32 (1961); *See* 5 C. Wright & A. Miller, Federal Practice and Procedure, §§ 1356, 1357 (1969). Moreover, in making this determination, the court must treat

> all facts contained in the complaint and every inference fairly deducible therefrom . . . as admitted and proved, viewing the same *in the light most favorable to the plaintiff.*

*Melo-Sonics Corporation, supra* at 858 of 342 F.2d (emphasis added).

In applying this standard to the defendant's amended counterclaims,[2] I conclude that sufficient claims for relief have been set forth.

### A. *The Individual Contract Counterclaim.*

In his amended individual counterclaim, defendant alleges a written franchise agreement with plaintiff entered into on March 29, 1966. He asserts that in December, 1972 plaintiff wrongfully breached the agreement when plaintiff unilaterally terminated it without cause. As a consequence of plaintiff's breach, defendant claims damages in the amount of $75,000.00. It is plaintiff's contention that defendant's claim for relief is insufficient in that it fails to allege the performance of all contractual obligations on the part of the defendant.

■ Assuming that performance is a necessary allegation to establish a claim

for relief in this case, it cannot be said that defendant's counterclaim is defective in this regard. As noted earlier, the court, in assessing the sufficiency of a claim, must treat all alleged facts and *every inference* fairly deducible therefrom as admitted and proved and view all in a light most favorable to (in this instance) defendant. *Melo-Sonics Corporation, supra* at 858. Following this liberal standard, it is possible to *infer* performance of contractual obligations by defendant from the denial in his answer (para. 5) of each and every allegation of breach set forth in plaintiff's complaint. With the drawing of this inference of performance, plaintiff's objections on this point are satisfied.[3]

■ Plaintiff also asserts as a ground for dismissal that defendant's counterclaim fails to disclose adequate information concerning the basis of defendant's claim for relief. Suffice it to say that the policy of the Federal Rules is "notice pleading", Conley v. Gibson, 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed. 2d 80 (1957), and under Federal Rule 8(a)(2) only "a short and plain statement of the claim showing that the pleader is entitled to relief" is required. As defendant has alleged a contract, a breach of that contract, resultant damages and, inferentially, performance of his contractual duties, he has satisfied the requirements of Rule 8(a)(2). If plaintiff is, nevertheless, unable to form a responsive pleading, his proper remedy is a motion for more definite statement under Rule 12(e). It is clear, however, that defendant's claim is based on an improper termination of the franchise agreement, and pretrial discovery can supply all necessary factual information.

### B. *The Class Action Antitrust Counterclaim.*

Defendant alleges in his amended counterclaim that plaintiff has illegally

---

2. In view of my ruling allowing amendment, this is the appropriate focus.

3. It is interesting to note that in plaintiff's own contract action against defendant, it has likewise failed to formally allege performance.

restrained competition in violation of the antitrust laws by:

17. . . . compelling defendant Tayloe and the other members of the class to purchase initial mechanical equipment from plaintiff by tying the purchase of such initial mechanical equipment to the franchises granted to defendant Tayloe and the other members of the class.

18. . . . compelling defendant Tayloe and the other members of the class to purchase their entire requirement of repair parts from plaintiff, including repair kits of plaintiff, by tying the purchase of such repair parts to the franchises granted to defendant Tayloe and the other members of the class.

19. . . . threatening to terminate the franchises of defendant Tayloe and the other members of the class if they did not purchase repair parts from plaintiff.

In essence, defendant has alleged an illegal tying arrangement whereby the purchase of initial equipment and repair parts is tied to the purchase of the Aamco franchise or trademark. Plaintiff basically contends that defendant's counterclaim fails to sufficiently expound the requisite elements of a tying arrangement claim. In resolving this issue, the court finds Siegel v. Chicken Delight, 448 F.2d 43 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), an appropriate guide. In the *Siegel* case, which dealt with the tying of certain production items to the grant of a Chicken Delight franchise, the Ninth Circuit set forth

the ingredients of an unlawful tying arrangement. Defendant's claim will be judged by this standard.

■■ First, the scheme in question must involve two distinct items and provide that one (the tying product) may not be obtained unless the other (the tied product) is also purchased. *Id.* at 47. It is not disputed that the instant case involves the Aamco trademark. Since a trademark has been held to constitute a distinct item,[4] the existence of two separate and distinct items can be adequately inferred in the instant case (i. e., the Aamco trademark and the initial equipment and repair parts). Furthermore, the Aamco Franchise Agreement, complaint, exhibit D, para. 6, allegedly requires franchisees to purchase, with certain exceptions, all initial equipment and repair parts from Aamco in exchange for the license to use the Aamco trademark. Thus, the necessary "tying" or linking of products is adequately averred.

Second, the tying product (Aamco trademark) must possess *sufficient economic power* appreciably to restrain competition in the tied product (initial equipment and repair parts) market. *Siegel, supra* at 47. Pursuant to this, plaintiff argues that defendant's counterclaim is deficient as it is devoid of any allegation of monopolistic position or market dominance with respect to the Aamco trademark. The Supreme Court in Fortner Enterprises, Inc. v. United States Steel Corp.,[5] 394 U.S. 495, 89 S. Ct. 1252, 22 L.Ed.2d 495 (1969), clearly stated that:

[t]he standard of "sufficient economic power" *does not,* as the District Court held, *require* that the defendant have

---

4. *See, e. g., Siegel, supra* at 47–49. Reasoning that "[i]t is not what is used, but how it is used and what results that have given the system and its end product their entitlement to trade-mark protection," *Id.* at 49, the *Siegel* court concluded that a trademark is separate and distinct from the multitude of separate articles used in the operation of the licensed system and the production of the end product.

5. In *Fortner,* an illegal tying arrangement was alleged against a parent corporation and its wholly owned subsidiary. Specifically, plaintiff asserted that in order to obtain a loan from the subsidiary, a customer had to agree to the purchase of a prefabricated home manufactured by the parent. In a 5–4 decision, the Court reversed the granting of defendant's motion for summary judgment. 394 U.S. 495, 496–498, 89 S.Ct. 1252, 22 L. Ed.2d 495.

*a monopoly or even a dominant position throughout the market* for the tying product. Our tie-in cases have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market.

*Id.* at 502–503, 89 S.Ct. at 1258 (emphasis added). Obviously, therefore, defendant's counterclaim cannot be defective on these grounds.

Plaintiff further argues that the counterclaim is insufficient as product uniqueness and consumer demand are not adequately alleged. It is not apparent, however, that such allegations are *always necessary* to establish the requisite "economic power." In United States v. Loew's Incorporated,[6] 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), the Court merely stated that "[t]he crucial economic power may be *inferred* from the tying product's desirability to consumers or from uniqueness in its attributes." *Id.* at 45, 83 S.Ct. at 102 (emphasis added).

■ In any event, however, I agree that defendant's allegation as to "sufficient economic power" is terse in that it simply avers that plaintiff's business is nationwide and consisting of over 500 franchises and consequently "[p]laintiff's franchises possess sufficient economic power to appreciably restrain competition in the initial mechanical equipment and repair parts product markets."[7] Nevertheless, when the counterclaim is assessed in view of *every* inference fairly deducible therefrom and

in the light most favorable to defendant Tayloe, I am unable to conclude that defendant can prove no set of facts to establish "sufficient economic power." Two positions support this conclusion. First, *Fortner* teaches that in analyzing the requisite economic power

the proper focus of concern is whether the seller has the power to raise prices, *or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market.*

*Fortner, supra* at 504 of 394 U.S., at 1259 of 89 S.Ct. (emphasis added). Following this reasoning, defendant Tayloe could possibly establish "sufficient economic power" by showing Aamco's ability to impose tie-in arrangements upon its franchisees [8] and by demonstrating the class of franchisees to be an "appreciable number of buyers within the market." Second, defendant could frame an argument based on the *Loew's* decision which indicated that "sufficient economic power" may be *inferred* from the tying product's uniqueness or desirability. In view of the fact that the tying product involved in this case is a trademark and in light of the holding in *Siegel* on the issue of product uniqueness and the Chicken Delight trademark, I am unable to conclude that defendant could not possibly prove a set of facts demonstrating "sufficient economic power" under the *Loew's* test.

The third requirement listed in *Siegel* to establish an unlawful tying arrangement is that a "not insubstantial" amount of commerce is affected by the arrangement. *Siegel, supra* at 47 of 448 F.2d. Although defendant's allegation on this point is "bare",[9] the court must

6. In *Loew's*, the illegal tying arrangement consisted of defendant's practice of conditioning the sale of feature films to television stations upon the acceptance by the station of a package or block containing one or more unwanted or inferior films. 371 U.S. 38, 40–44, 83 S.Ct. 97, 9 L.Ed.2d 11.

7. Defendant's amended counterclaims, para. 22.

8. Of course, I am assuming that defendant could show that each member of the class

agreed to a franchise agreement similar to the one attached to plaintiff's complaint, exhibit D. Defendant in his counterclaim merely states that the class consists of all those who purchased a franchise of plaintiff and makes no mention of the terms of those purchase agreements.

9. The counterclaim merely avers that "[a] not insubstantial amount of interstate commerce is affected by plaintiff's arrangement."

again assess every inference fairly deducible from the counterclaim in a light most favorable to the defendant. In this regard, I must take note of the fact that Aamco's franchising business is alleged in both the plaintiff's complaint and defendant's counterclaim to be nationwide and consisting of over 500 franchises in the United States and Canada. It is difficult for the court to conclude, at this stage of the proceeding, that an insubstantial amount of commerce is involved. Consequently, defendant has sufficiently alleged a claim for relief under the antitrust laws.

This decision is not only supported by the tie-in decisions cited above, but is also sensitive to the restrictive policy that has been expressed by the Supreme Court with respect to pretrial dismissals of antitrust actions. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 500, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (summary judgment); Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (summary judgment); Radovich v. National Football League, 352 U.S. 445, 453–454, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) (motion to dismiss). *Accord*: Stokes Equipment Company v. Otis Elevator Company, 340 F.Supp. 937, 942 (E.D.Pa.1972) (motion to dismiss). The words of Mr. Justice Clark in Radovich v. National Football League are particularly appropriate for the case at bar. In reversing the lower court decisions to grant dismissal of an antitrust action, the Court stated:

> [w]hile the complaint might have been more precise in its allegations concerning the purpose and effect of the conspiracy, "we are not prepared to say that nothing can be extracted from this bill that falls under the act of Congress. . . ." [citation omitted]

> \* \* \* \* \* \*

We think that Radovich is entitled to an opportunity to prove his charges.

*Radovich, supra* at 453–454 of 352 U.S., at 395 of 77 S.Ct. I feel that Tayloe is similarly entitled.

In view of ruling that the class action antitrust counterclaim sufficiently alleges a claim for relief, it will be necessary for the court to determine whether the action may be maintained as a class action under Federal Rule 23. The stay of discovery ordered by this court on June 28, 1973 with respect to class action issues is vacated and discovery is directed to proceed on this matter to be completed by December 15, 1973. By December 31, 1973, defendant Tayloe should file the proper motion and supporting memorandum under Federal Rule 23 for class determination. As this class action counterclaim has been consolidated with the class action claim of plaintiff Paro in Paro v. Aamco, Paro is similarly so ordered. Accordingly, any responsive briefs or memoranda by Aamco should be concurrently filed with the above Rule 23 motion. Defendant Tayloe's motion for a separate trial of the class action counterclaim will not be considered until such time as determination is made as to whether the action may proceed as a class action.

3. *Motion of Defendants Jimran Corporation (Jimran), Crossroads Transmissions, Inc. (Crossroads), and Edward R. Valencia (Valencia) to Dismiss for Lack of Personal Jurisdiction.*

Defendants Jimran, Crossroads, and Valencia have moved the court pursuant to Federal Rule 12(b)(2) to dismiss plaintiff's complaint for lack of jurisdiction over the parties. The Federal Rules of Civil Procedure permit effective service of process anywhere within the territorial limits of the state in which the district court is held and beyond the territorial limits of that state whenever authorized by a statute of the United States or the state in which the district court is held. Fed.R.Civ.P. 4(d)(7), 4(e), 4(f). Based on this rule,

defendants assert the failure to be personally served within Pennsylvania[10] and the lack of any applicable "long-arm" statute authorizing extraterritorial service of process as their grounds for dismissal. Several theories have been advanced by plaintiff to sustain jurisdiction over the several defendants. Due to the distinctiveness of the arguments, each will be separately treated.

#### A. *The Lanham Trademark Act.*

Plaintiff avers jurisdiction over the parties via Sections 1116 and 1121 of the Lanham Trademark Act.[11] 15 U.S.C. §§ 1116, 1121. Before reaching the question of the extraterritorial effect of these sections, it must be noted that the only claims asserted by plaintiff against these defendants are conspiracy and intentional interference with contractual relations. Plaintiff has not alleged that defendants infringed, used or threatened to use any registered trademark of plaintiff. Apparently, plaintiff's sole basis for Lanham Act jurisdiction is the "substantial damage to its trade name and reputation" which allegedly resulted from defendants' actions. In light of the recent decision of Chief Judge Lord in Plum Tree, Inc. v. Seligson, 342 F. Supp. 1084 (E.D.Pa.1972), wherein an action for breach of a franchise agreement, similar to the present action of Aamco against defendant Tayloe, was held to state no claim under the Lanham Act, it is doubtful whether plaintiff's claims against defendants arise under the Lanham Act. Assuming, however, that the Lanham Act is involved in the instant case, Sections 1116 and 1121 do not provide a basis for personal jurisdiction over defendants.

Plaintiff concedes that the Lanham Act makes no express provision for extraterritorial service of process. It contends, however, that the above sections implicitly provide for such service. I disagree. Section 1121 simply confers subject-matter jurisdiction upon United States District Courts in all actions arising under Chapter 22 of Title 15 regardless of the amount in controversy or citizenship of the parties. Section 1116 allows nationwide service of an injunction once granted by a district court vested with jurisdiction over Chapter 22 cases. Nothing in the language of either section, explicitly or implicitly, authorizes extraterritorial service of process. In fact, it is fair to say that Section 1116 assumes that the issuing court was properly vested with jurisdiction over the subject-matter and the parties. Additionally, no cases have been cited nor have any been located supporting plaintiff's interpretation of these sections. Nor has anything been cited or found in the legislative history of the Lanham Act to support the contentions. Moreover, a reading of other provisions authorizing extraterritorial service of process indicates that Congress has been specific in its terminology when such an effect has been intended. *E. g.*, 28 U.S.C. § 2361, which allows nationwide service of process in civil actions of interpleader under Section 1335 of Title 28. I conclude, therefore, that Sections 1116 and 1121 provide no basis to obtain extraterritorial personal jurisdiction over these defendants.[12]

#### B. *The Pennsylvania "Long-Arm" Statute.*

Plaintiff also avers jurisdiction over these defendants by virtue of the new

10. The service of process records of the U.S. Marshals, attached to plaintiff's complaint and defendants' motion to dismiss, indicate that Jimran and Crossroads were served in Virginia and Valencia was served in Maryland.

11. The Lanham Trademark Act, 15 U.S.C. §§ 1051 et seq., which is set forth in Chapter 22 of Title 15, basically concerns the registration of trademarks, the rights of owners of registered trademarks, and the available remedies for trademark infringement.

12. *See also* 2 J. Thomas McCarthy, Trademarks and Unfair Competition, § 32 :14 (1973) where the author notes that "[a]lthough Congress has the power to authorize nationwide service and power for federal courts, it has not chosen to do so in cases of trademark infringement or unfair competition."

Pennsylvania "Long-Arm" statute. Pa. Stat. tit. 42 §§ 8301–8311 (Supp.1973–1974). Formerly, the "long-arm" provisions were codified in Section 2011 of Title 15, dealing with foreign corporations, and Sections 341–346 of Title 12, dealing with nonresident individuals. Pa.Stat. tit. 12 §§ 341–346; Pa.Stat. tit. 15 § 2011. These sections were repealed by the new statute which went into effect February 13, 1973. Under the new "long-arm" statute, plaintiff relies on Section 8302, which deals with foreign corporations, to establish jurisdiction over Jimran Corporation and Crossroads Transmissions, Inc. Respecting Valencia, the bases of jurisdiction are Sections 8303 and 8305. In making this jurisdisdictional determination, two questions are presented. First, is the conduct of the defendants within the relevant provisions. Secondly, if the statutory requirements are satisfied, does the application of those provisions in the context of this case violate the Constitutional requisites of due process. As the jurisdictional sections applicable to the defendants differ, separate treatment is appropriate.

#### (1) *Jimran and Crossroads*

Jimran and Crossroads are neither incorporated under the laws of Pennsylvania nor registered to do business in Pennsylvania.[13] Plaintiff therefore seeks to serve process pursuant to Section 8302(a) which states:

> Any foreign corporation which *shall have done any business* in this Commonwealth without procuring a certificate of authority . . . shall be conclusively presumed to have designated the Department. of State . . . to accept, on its behalf, serv-

ice of process *in any action arising within this Commonwealth.*

Pa.Stat. tit. 42 § 8302(a) (Supp.1973–1974) (emphasis added). Essential to this section is a finding that the defendant corporations have done business in Pennsylvania as defined by Section 8309(a). That section states:

> Any of the following shall constitute "doing business" for the purposes of this chapter:
>
> (1) The doing by any person in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object.
>
> (2) The doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object with the intention of initiating a series of such acts.
>
> (3) The shipping of merchandise directly or indirectly into or through this Commonwealth.
>
> (4) The engaging in any business or profession within this Commonwealth, whether or not such business requires license or approval by the Commonwealth or any of its agencies.
>
> (5) The ownership, use or possession of any real property situate within this Commonwealth.

Pa.Stat. tit. 42 § 8309(a)(1)–(5) (Supp.1973–1974).

Repealed Section 344 of Title 12, which was initially enacted in 1970 to deal with jurisdiction over nonresident individuals, contained a similar definition of "doing business".[14] However, it

---

13. Both Jimran and Crossroads are Virginia Corporations with registered offices within that state.

14. Section 344 read:
 For the purpose of determining the jurisdiction of the courts within this Commonwealth, the doing by any individual within this Commonwealth of a series of similar acts for the purpose of thereby realizing

pecuniary benefit or otherwise accomplishing an object, or the doing of a single act in this Commonwealth for. such purpose with the intention of initiating a series of such acts, or the shipping of merchandise directly or indirectly into or through this Commonwealth, or the engaging in any business or profession within this Commonwealth whether or not such business or profession requires licensure or ap-

is necessary to examine Section 2011 C, the definitional predecessor of Section 8309(a) which evolved under the old foreign corporation "long-arm" statute (Section 2011 of Title 15), in order to properly assess the scope and meaning of the new section. Section 8309(a) repealed Section 2011 C which defined "doing business" under that former statute. That section read, after amendment in 1968:

> For the purposes of determining jurisdiction of courts within this Commonwealth, the doing by any corporation in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object, or doing a single act in this Commonwealth for such purpose, with the intention of thereby initiating a series of such acts, shall constitute "doing business." For the purposes of this subsection the shipping of merchandise directly or indirectly into or through this Commonwealth shall be considered the doing of such an act in this Commonwealth.

Pa.Stat. tit. 15 § 2011 C, as amended, Acts 1968, July 20, P.L. 459, No. 216, § 54. A comparison of the new Section 8309(a) with the above section reveals significant similarities and modifications. The new statute enumerates five independent activities which in and of themselves constitute "doing business." In the repealed section, only two types of conduct established "doing business": the doing of a series of acts for the purpose of realizing pecuniary benefit or the doing of a single act for such purpose with the intention of initiating a series of such acts. Although the direct or indirect shipment of merchandise into the state was referred to, it was merely

cited as an example of this latter type of conduct, i. e., a single act done for the purpose of realizing pecuniary benefit with the intention of initiating a series of such acts, and *not* as a separate and distinct basis of "doing business." *Aquarium Pharmaceuticals, Inc. v. Industrial Pressing & Packaging, Inc.,*[15] 358 F.Supp. 441, 443 (E.D.Pa.1973); *See* Gorso v. Bell Equipment Corporation,[16] 476 F.2d 1216, 1221 (3rd Cir. 1973). As a consequence of this phraseological linkage, the shipment of merchandise into the state did not establish "doing business" unless the requirements of the previous sentence, the "series . . . or single act" language, were also satisfied. In other words, the shipment of merchandise, directly or indirectly, into the state did not, by itself, constitute "doing business" unless it was done for the purpose of realizing pecuniary benefit and with the intention of initiating a series of such acts. *Aquarium, supra* at 443 of 358 F.Supp.; *see Gorso, supra* at 1221–1222 of 476 F.2d.

In subsection (a) (1) and (2) of the new statute, the two basic methods of establishing "doing business" under Section 2011 C, i. e., the doing of a series of acts or a single act with the intention of initiating a series of such acts, are re-enacted in identical language. However, the "series . . . or single act" requirements now incorporated in subsections (a)(1) and (2), no longer apply to the shipment of merchandise into the state. Subsection (a)(3) makes "the shipping of merchandise directly or indirectly into or through this Commonwealth" an independent form of "doing business" without any requirement that shipment be made with the intention of initiating a series of such acts. *Aquarium, supra* at 443 of 358 F.

---

proval by the Commonwealth or any of its agencies, or the ownership, use or possession of any real property situate within this Commonwealth, shall constitute "doing business."

Pa.Stat. tit. 12 § 344, Acts 1970, July 1, P.L. 444, No. 152, § 4.

15. The *Aquarium* case dealt with Section 8309 of the new "long-arm" statute. Pa. Stat. tit. 42 § 8309 (Supp. 1973–1974).

16. The *Gorso* case dealt with Section 2011 C, as amended in 1968, of the repealed "long-arm" statute. Pa.Stat. tit. 15 § 2011 C, as amended, Acts 1968, July 20, P.L. 459, No. 216, § 54.

Supp. Finally, the new statute adds to the list of "doing business" activities, the engaging in any business or profession within the state, Section 8309(a)(4), and the ownership, use or possession of any real property situate in the state, Section 8309(a)(5).

With this review as background, it is appropriate to apply the new statute to the facts of the instant case. Plaintiff has made no allegation that the defendants shipped merchandise into the state directly or indirectly, engaged in any business or profession within the state, or owned, used or possessed any real property within the state. Therefore, subsections (a)(3), (4) and (5) of Section 8309 can provide no basis for jurisdiction. The only subsections possibly applicable are (a)(1) and (2).

As noted earlier, the "series . . . or single act" language contained in subsections (a)(1) and (2) was identically reproduced from Section 2011 C of the old statute. Additionally, it should be noted that since the adoption of 2011 C in 1959, its "series . . . or single act" language was not altered by subsequent amendments. Resultantly, cases interpreting the critical "series . . . or single act" language under Section 2011 C remain relevant precedent when the issue is the interpretation of that same language in subsections (a)(1) and (2) of the new law.[17] Two such cases are Myers v. Mooney Aircraft, Inc.[18] 429 Pa. 177, 240 A.2d 505 (1967), and Gorso v. Bell Equipment Corporation, 476 F.2d 1216 (3rd Cir. 1973). In construing the "series . . . or single act" language of Section 2011 C, the Pennsylvania Supreme Court stated in Myers:

[t]he statute contemplates [by use of the "series . . . or single act" language] a systematic course of conduct as contrasted with isolated or sporadic occurrences.

Myers, supra at 185 of 429 Pa., at 510 of 240 A.2d (emphasis added) (citation omitted). The Third Circuit in the recent Gorso decision cited the above interpretation as controlling in determining whether the acts of two foreign corporations constituted "doing business" under the "series . . . or single act" language of Section 2011 C. Although the question of "doing business" is a matter of fact to be resolved on a case-by-case basis,[19] the factual application of the "doing business" requirements in Gorso are highly relevant to the instant case. In Gorso, personal jurisdiction was sought over two French companies. One manufactured tower cranes used in the construction industry while the other was its exclusive sales agent. As in the instant case, neither company was registered to do business in Pennsylvania nor did either maintain an office in the state. Through the national sales agent of the companies, a crane was sold outside the State of Pennsylvania to a Kansas corporation. After use in Ohio, the crane was delivered and used at a jobsite in Pennsylvania. Thereafter the crane collapsed and injured several workers in Pennsylvania. Since Pennsylvania has adopted the theory that a tort is committed at the place at which the tortious conduct culminates in injury,[20] it was averred, inter alia, that one possible contact on which a finding of "doing business" could be based was the commission of a tort within Pennsylvania. Additionally, defendants had made several deliveries

---

17. However, when the issue focuses on subsection (a)(3) of the new law, the precedential value of these earlier cases must be re-examined in view of the change, noted earlier, respecting the shipment of merchandise into the state and the "series . . . or single act" requirements.

18. The *Myers* case dealt with Section 2011 C of the repealed statute prior to the 1968 amendment.

19. Wenzel v. Morris Distributing Co., 439 Pa. 364, 371, 266 A.2d 662 (1970); Myers v. Mooney Aircraft, Inc., 429 Pa. 177, 185, 240 A.2d 505 (1967).

20. *Gorso, supra* at 1221 of 476 F.2d; Wilk v. Ensign-Bickford Co., 421 Pa. 161, 164, 218 A.2d 778 (1966).

of spare parts into Pennsylvania and this conduct was also alleged to constitute "doing business" in Pennsylvania.

The *Gorso* court dismissed these contentions stating:

> [i]n this context, we are unprepared to say the two shipments of spare parts into the state combined with the constructive tortious conduct within the state together demonstrated a systematic course of conduct within Pennsylvania by appellants. Rather, they are no more than sporadic occurrences and resultantly, are insufficient to satisfy statutory prerequisites for the exercise of personal jurisdiction by the state courts in the absence of a prior in-state sale.

*Gorso, supra* at 1223 (footnote omitted).

In the instant case, an analogous situation is presented. The two torts asserted against Jimran and Crossroads, conspiracy and intentional interference with contractual relations, allegedly caused "loss of income and profits and other substantial damage to [the Aamco] trade name and reputation." This injury, at least in part, occurred in Pennsylvania. Plaintiff is incorporated in Pennsylvania and maintains its principal place of business in Pennsylvania. Consequently, loss of income and profits will be registered here. Damage to reputation and trade name, though, would only occur where that damage has in fact been sustained. As the complaint is devoid of any allegation respecting the situs of this reputation and trade name damage, it affords the court no basis for determining the location of this alleged damage. Thus, I cannot speculate as to whether or not reputation damage has been suffered within this state. In any event, some harm has' occurred in Pennsylvania in the form of lost income and profits. Hence, the defendants' torts, at least in part, constructively occurred within Pennsylvania under this state's concept of the "place of the tort." This result obtains even though the actual tortious conduct took place entirely outside the state.

In this sense, the case is similar to *Gorso* in that constructive tortious conduct is the act allegedly done within the state. In *Gorso*, though, the defendants had also performed the additional acts of shipping spare parts into the state. Nevertheless, the *Gorso* court held that the combined effect of the constructive tortious conduct and the shipments was insufficient to establish the requisite "systematic course of conduct" necessary for a showing of "doing business" under the "series . . . or single act" language. In the instant case, the constructive tortious conduct is the only act allegedly performed in this state by defendants. In view of *Gorso*, it follows *a fortiori* that this conduct, standing alone, does not constitute a "systematic course of conduct." It rather represents an "isolated or sporadic occurrence" under the *Myers* test and consequently is inadequate to establish "doing business" under the "series . . . or single act" language of subsections (a)(1) and (2). I therefore conclude that Jimran and Crossroads are not "doing business" under any of the above provisions of Section 8309 of the new "long-arm" statute.

Although not mentioned by the plaintiff, the new statute contains a provision never before incorporated in a Pennsylvania "long-arm" statute. Section 8309(b) states:

> In addition to the provisions of subsection (a) of this section the jurisdiction and venue of courts of the Commonwealth shall extend to all *foreign corporations* and the powers exercised by them to *the fullest extent allowed under the Constitution of the United States.*

Pa.Stat. tit. 42 § 8309(b) (Supp.1973–1974) (emphasis added).

The issue therefore is whether the exercise of jurisdiction over Jimran and Crossroads would violate the Constitutional requisites of due process. As the same question is presented with respect to Valencia, the constitutional question will be decided in a later portion of this opinion.

### (2) *Valencia*

Nothing is averred in plaintiff's complaint indicating that Valencia resides, works or conducts any activity, business or personal, within the State of Pennsylvania. The sole bases for jurisdiction over Valencia are Sections 8303 and 8305 of the Pennsylvania "long-arm" statute. Section 8303 provides in pertinent part:

*Any nonresident . . . who, acting individually, . . . shall have committed a tortious act within this Commonwealth . . .* shall be conclusively presumed to have designated the Department of State as his agent for the receipt of service of process in any civil action or proceeding instituted in the courts of this Commonwealth against such individual.

Pa.Stat. tit. 42 § 8303 (Supp.1973–1974).

Section 8305 states:

*Any nonresident . . . who, acting outside of this Commonwealth, individually, . . . shall have caused any harm within this Commonwealth . . .* shall be subject to service of process in any civil action or proceeding instituted in the courts of this Commonwealth arising out of or by reason of any such conduct.

Pa.Stat. tit. 42 § 8305 (Supp.1973–1974).

The action against Valencia is identical to that against Jimran and Crossroads. The asserted torts are conspiracy and intentional interference with contractual relations while the alleged damage is "loss of income and profits and other substantial damage to [the Aamco] trade name and reputation." Pursuant to the Pennsylvania concept of "place of the tort", discussed *supra,* Valencia has constructively committed these torts within Pennsylvania as this is the "place of the injury." Consequently,

Section 8303 is applicable. Section 8305, which merely requires the causation of any harm within the state, is likewise satisfied as plaintiff suffered some injury in Pennsylvania by reason of defendant's torts.[21]

As the requirements of the "long-arm" statute are met, the Constitutional question of due process arises. A similar issue is presented under Section 8309 (b) with respect to Jimran and Crossroads. Succinctly stated, the question is whether personal service can be made upon Valencia, under Sections 8303 and 8305, and upon Jimran and Crossroads, under Section 8309(b), consistent with the Constitutional requirements of due process.

### The Constitutional Test

Traditionally, jurisdiction over the person could only be secured by the actual physical presence of the defendant within the territorial limits of the forum state. Pennoyer v. Neff, 95 U.S. 714, 733, 24 L.Ed. 565 (1877). The Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), abandoned this rigid territorial standard and adopted an expanded concept of due process and personal jurisdiction. The Court held that in order to render a valid *in personam* judgment over a nonresident, due process required only the existence of "certain minimum contacts" between the nonresident and the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* at 316, 66 S.Ct. at 158 (citation omitted). Although a precise definition of "minimum contact" was not enunciated by the *International Shoe* Court, the opinion did express the judicial philosophy underlying the new approach to due process and personal jurisdiction. In signif-

---

21. Section 8304 also extends jurisdiction over a nonresident individual who does any business within the Commonwealth. Pa.Stat. tit. 42 § 8304 (Supp. 1973–1974). Plaintiff has not cited this section as a possible basis for jurisdiction over Valencia. However, it is clear that Valencia has not done business in Pennsylvania under the rules of *Myers* and *Gorso.*

icant language, Chief Justice Stone stated:

> to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

*Id.* at 319, 66 S.Ct. at 160. In analyzing the case in view of this standard, the *International Shoe* Court focused on the systematic and continuous business activities of the defendant within the state.[22] Via these activities,[23] defendant received the benefits and protection of the laws of the state. Consequently, the activities qualified as the type of "minimum contacts" which would "make it reasonable and just according to our traditional conception of fair play and substantial justice" to subject defendant to the jurisdiction of the state. *Id.* at 320, 66 S.Ct. at 160.

Although the basic rationale of *International Shoe* has been repeatedly affirmed by the courts, the case was followed by three important Supreme Court decisions analyzing the constitutional question of jurisdiction over non-residents. These decisions, together with *International Shoe*, establish the principles which must govern the instant case. In Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), the Court reiterated the *International Shoe* requirement of "minimum contacts" and held that this requirement could be satisfied, even though the cause of action arose from activities performed by the defendant outside the forum state, if the business done by the defendant within the state was of a sufficiently substantial nature.[24] In McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), the Court, after referring to the *International Shoe* test, held that "[i]t is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with [the forum] State."[25] Finally, in Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), Chief Justice Warren, noting the exceedingly liberal posture of the courts concerning personal jurisdiction requirements, warned that "it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts." *Id.* at 251, 78 S.Ct. at 1238. In renewing the holding of *International Shoe*, Chief Justice Warren stated:

> [t]he application of that [minimum contacts] rule will vary with the quality and nature of the defendant's activity, but *it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking*

22. The defendant, a foreign corporation manufacturing shoes, had solicited orders within the state through its resident salesmen and shipped these orders on a "systematic and continuous" basis into the state. *Id.* at 313–314, 66 S.Ct. 154.

23. The Court also noted that the obligation sued on arose out of these very activities. *Id.* at 320, 66 S.Ct. 154.

24. 342 U.S. at 446–448, 72 S.Ct. 413. In that case, the in-state activities of the defendant corporation included directors' meetings, business correspondence, banking, stock transfers, payment of salaries, and the purchase of machinery. *Id.* at 447–448, 72 S. Ct. 413. As such, due process was not violated by the extension of personal jurisdiction over it by the forum state.

25. 355 U.S. at 223, 78 S.Ct. at 201. In *McGee*, suit was brought in California against a foreign insurance company on a policy issued to a resident of California. The contract had been delivered in California, the premiums were mailed from there and the insured was a resident of that state when he died. Upon this basis, the Court found the requisite "substantial connection" to establish jurisdiction. *Id.* at 223–224, 78 S.Ct. 199.

*the benefits and protections of its laws.*

*Id.* at 253, 78 S.Ct. at 1240 (emphasis added) (citation omitted).

■ Applying the concepts of these cases to the facts of the instant matter, it is clear that the exercise of jurisdiction over defendants Jimran, Crossroads and Valencia under the Pennsylvania "long-arm" statute would violate the due process requirements of the Constitution. Specifically, the necessary "minimum contacts". cannot be established under any of the approaches examined above.

In *Perkins*, the Court concluded that jurisdiction was "fair and reasonable" under the circumstances since the defendant had engaged in substantial business activity within the state. In the instant case, however, there is no evidence of any analogous conduct as the only contact alleged between the defendants and Pennsylvania is the constructive tortious conduct involved in the litigation. Under the *McGee* test, as stated by the Third Circuit, due process requirements are satisfied if the "cause of action" has a substantial connection with the forum state.[26] In the instant case, the claims against the defendants are conspiracy and intentional interference with contractual relations. In determining whether or not these causes of action have a substantial connection with Pennsylvania, the case of Consolidated Laboratories, Inc. v. Shandon Scientific Company, 384 F.2d 797 (7th Cir. 1967), is relevant. That case similarly involved charges of conspiracy to interfere with contractual relations. The Seventh Circuit, citing *McGee*, held the contacts between the defendants and the forum state sufficient to satisfy the requirements of due process. In that case, the tortious conduct, alleged to be the advertisement and solicitation of sales in violation of plaintiff's contractual rights, *actually* occurred within the forum state. In addition, the harm to the plaintiff was suffered in that state.

In the instant case, however, the *actual* tortious conduct took place outside the State of Pennsylvania while only some of the harm to plaintiff occurred here. In this sense, the case is significantly different from *Consolidated Laboratories* in terms of due process. Moreover, when this contact is assessed in view of the basic due process requirement of reasonableness and fairness "according to our traditional conception of fair play and substantial justice," I cannot conclude that this single occurrence in Pennsylvania (harm to plaintiff) constitutes a *"substantial connection"* under *McGee* sufficient to justify the exercise of jurisdiction over these defendants.

Finally, the necessary "minimum contacts" cannot be established under the tests of *International Shoe* and *Hanson*. These cases clearly require the existence of some act "by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson, supra* at 253 of 357 U.S., at 1240 of 78 S.Ct. The reason for this requirement is plain. When a nonresident receives the benefits and protections of the forum state's laws, it is fair and reasonable in terms of due process for that nonresident to submit to the jurisdiction of the courts of that state. In applying this rule to the instant case, jurisdiction is clearly inappropriate. The only acts performed by defendants within the State of Pennsylvania are the constructive commission of the asserted torts. Defendants are not alleged to have done any other act or acts within this state, whether past or current, business or personal, direct or indirect, constructive or actual by which the benefits and protections of Pennsylvania law were bestowed upon them. Under the facts of this case, it cannot be said that defendants, by this constructive tortious conduct, have "purposefully availed" themselves of the "privilege of conducting activities" in Pennsylvania or received the

---

**26.** Bernardi Bros. Inc. v. Pride Manufacturing, Inc., 427 F.2d 297, 299 (3rd Cir. 1970).

"benefits or protections" of its laws. Therefore, jurisdiction is not justified under *International Shoe* and *Hanson*.

By this ruling, I am not unmindful of the Illinois Supreme Court decision in Gray v. American Radiator & Standard Sanitary Corporation, 22 Ill.2d 432, 176 N.E.2d 761 (1961), often cited as a leading authority in this area. Under the facts presented in *Gray*, jurisdiction over a nonresident who had constructively committed a tortious act within the state was held to be constitutionally permissible. Specifically, a hot water heater containing one of defendant's valves had exploded and caused injury in Illinois. As the valve was manufactured and sold outside the state, the tortious act was only constructively committed there. In this sense, the case is analogous to the instant matter. However, the similarity ends here. In discussing the constitutional test of due process, the court, citing *International Shoe* and *Hanson,* noted that:

> the relevant inquiry is whether defendant engaged in some act or conduct by which he may be said to have invoked the benefits and protections of the law of the forum.

*Id.* at 765.

In applying this rule, the *Gray* court inferred from the record substantial use and consumption within the state of appliances incorporating defendant's valves. Consequently, the court concluded that:

> [t]o the extent that its business may be directly affected by transactions occurring here it enjoys benefits from the laws of this State, and it has undoubtedly benefited, to a degree, from the protection which our law has given to the marketing of hot water heaters containing its valves.

*Id.* at 766. In the instant case, defendants have not conducted any activity in the State of Pennsylvania from which a similar conclusion of "benefit and protection" receipt can be drawn. *Gray,* therefore, does not control the instant suit.

I conclude that the principles of due process as interpreted by the Supreme Court in the previously examined cases prohibit the exercise of jurisdiction over Jimran, Crossroads, and Valencia under the applicable provisions of the Pennsylvania "long-arm" statute.

### C. The "Alter Ego" Theory.

In paragraph 22 of the franchise agreement between plaintiff and defendant Tayloe, Tayloe consented to the jurisdiction of this court and he does not challenge that jurisdiction. Plaintiff argues that the defendants Jimran, Crossroads, and Valencia "serve as the legal alter egos and strawmen to Defendant Tayloe's financial dealings." Consequently, Tayloe's consent to jurisdiction can be imputed to the other defendants as all represent one legal entity in the person of Tayloe. If this contention were established, the due process problems noted earlier are obviated as Tayloe, the single legal entity, has submitted to jurisdiction.

It is a fundamental tenet of corporation law, that a corporation, as Jimran or Crossroads, is a legal entity, separate and distinct from its stockholders, directors, and officers. Gottlieb v. Sandia American Corporation, 452 F.2d 510, 514 (3rd Cir.), cert. denied, 404 U. S. 938, 92 S.Ct. 274, 30 L.Ed.2d 250 (1971); Kauffman v. Dreyfus Fund Inc., 434 F.2d 727, 733 (3rd Cir.1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); Zubik v. Zubik, 384 F.2d 267, 273 (3rd Cir.1967), cert. denied, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968). Furthermore, the court must recognize and uphold this corporate identity unless *"specific, unusual circumstances call for an exception." Zubik, supra* at 273 (emphasis added). In this regard, the plaintiff bears the burden of proving that the corporate entity should be disregarded. *Id.* at 270.

With this brief background as perspective, plaintiff's argument can be analyzed. Although no case has been

found which directly supports the particular theory in this case, there are analogous cases which support the utilization of the "alter ego" doctrine to secure jurisdiction over nonresident corporations upon a finding that either the "dominant" or "subservient" corporation does business within the state. In re Puerto Rico Air Disaster Litigation, 340 F.Supp. 492 (D.P.R.1972), illustrates the former situation. In that case, jurisdiction was sought over a nonresident subsidiary corporation doing no business within Pennsylvania. The parent corporation, however, was doing business in Pennsylvania and was, therefore, subject to the court's jurisdiction. The court held jurisdiction would lie over the subsidiary if it was shown that the parent was the subsidiary's alter ego. Id. at 496.[27] Similarly, in the instant case, the court has jurisdiction over the "parent", Tayloe, and therefore, by analogy, an argument for jurisdiction over the "subsidiaries", Jimran and Crossroads, could be made if it were established that these corporations were the mere "alter egos" of Tayloe. However, plaintiff has failed to satisfy its factual burden. To prove its theory, plaintiff notes that defendant Tayloe, his wife and son are the officers and directors of Jimran and that Tayloe's son was a director of Crossroads. However, *Gottlieb*, *Kauffman*, and *Zubik* indicate that a corporation is separate and distinct from its officers and directors. Consequently, these facts alone do not justify the disregard of Jimran's and Crossroads' corporate identity. Additionally, plaintiff has reviewed the details of a Jimran stock sale from Tayloe to Valencia, a subsequent resale of Jimran stock from Valencia to Jimran, and a sale of particular Jimran assets from Jimran to Valencia. Although these transactions indicate a certain interrelationship among the defendants, the cases require a greater quantum of evidence demonstrating a clear lack of demarcation between the individual and the corporation. *See, e. g., Zubik, supra* and the numerous cases cited therein. Nevertheless, it is not absolutely certain that plaintiff will be unable to meet this burden, at least with respect to Jimran. The Third Circuit in Fraley v. Chesapeake & Ohio Railway Company, 397 F. 2d 1 (3rd Cir.1968), held it error for the district court to dismiss a complaint for lack of personal jurisdiction without first requiring defendant to answer interrogatories aimed at establishing jurisdictional facts. *Id.* at 3. By analogy, plaintiff's complaint should not be dismissed until he is granted ample opportunity to prove his jurisdictional allegations through discovery. Discovery will, therefore, be allowed on this issue to be completed by December 15, 1973. Thereafter, plaintiff should file additional briefs on this matter by December 31, 1973. Unless supplemental briefs are forthcoming at that time, the complaint as to Jimran, Crossroads, and Valencia will be dismissed as plaintiff has failed to prove *in personam* jurisdiction over these defendants. In the event of dismissal, Virginia would appear the appropriate forum for securing jurisdiction over these defendants and nothing in this case would appear to preclude plaintiff from instituting suit in that jurisdiction.

---

27. *Accord:* Fitzgerald v. Hilton Hotels Corporation, 183 F.Supp. 342 (E.D.Pa.1960). Cases involving a nonresident parent whose subsidiary did business within the forum state and supporting the "alter ego" doctrine are: Cannon Manufacturing Company v. Cudahy Packing Company, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925); Scalise v. Beech Aircraft Corporation, 276 F.Supp. 58, 62 (E.D.Pa.1967); Smeltzer v. Deere & Co., 252 F.Supp. 552, 555–556 (W.D.Pa.1966); Electrosonics Int'l Inc. v. Wurlitzer Co., 234 F.Supp. 913, 917 (E.D.Pa.1964); Botwinick v. Credit Exchange, Inc., 419 Pa. 65, 213 A. 2d 349 (1965); Rumig v. Ripley Manufacturing Corp., 366 Pa. 343, 77 A.2d 360 (1951).