**In re Paul R. CARROLL, Bankrupt.**

**Charles W. SNYDER and Patricia C. Snyder, Plaintiffs,**

**v.**

**Paul R. CARROLL, Defendant.**

**In re HERITAGE BUILDING, INC., Bankrupt.**

**Charles W. SNYDER and Patricia C. Snyder, Plaintiffs,**

**v.**

**HERITAGE BUILDING, INC., Defendant.**

**Bankruptcy Nos. 79–01250, 79–01251.**

United States Bankruptcy Court, E. D. Virginia, Richmond Division.

June 2, 1981.

James F. Parkinson, III, Richmond, Va., for bankrupt/defendants.

J. Stephen Buis, Richmond, Va., for plaintiffs.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

On September 7, 1979, Heritage Building, Inc., a Virginia corporation, and Paul R. Carroll filed Petitions in Bankruptcy under the Bankruptcy Act of 1898, as amended. On January 3, 1980, Charles W. Snyder and Patricia C. Snyder (Snyders) filed Complaints objecting to the discharge and, in the alternative, the determination of non-dischargeability against Heritage Building, Inc. (Heritage) and Paul R. Carroll (Carroll) for the cost of uncompleted work on the Snyders' home. After Answers were filed by the Defendants Heritage and Carroll, the matters were consolidated for the purpose of trial, and after said trial and briefs in argument, the Court makes the following determination.

### STATEMENT OF THE CASE

On April 21, 1979, the Snyders contracted with Heritage for the purchase of 2241 Banstead Road (Lot 10, Block Q, Winterfield Section, Salisbury, Chesterfield County, Virginia). When the contract to purchase was executed, the dwelling on said real estate was in a partial state of completion. During May, June, July and August of 1979, Heritage undertook to complete the construction of the house pursuant to the terms of the contract. The original completion date was scheduled for July 1, 1979 and the closing planned for August 1, 1979. The building was not completed in time for the proposed August 1 settlement date and the closing was rescheduled for August 16, 1979. At the closing, there was considerable discussion by the parties as to the unfinished items to the dwelling. At that time an agreement was entered into between the Snyders and Heritage wherein 13 items of unfinished work were to be completed by Heritage. To insure the completion of that work, it was agreed that $1,000 of the purchase price would be placed in escrow by the Snyders. It was apparently thought that $1,000 would be sufficient to defray the costs of the completion of the unfinished work. Heritage completed some of the work but the larger portion of the work was not done prior to the time Heritage and Carroll filed their Petitions in Bankruptcy. Neither Heritage nor Carroll have received the $1,000 escrow deposit. An estimate of the uncompleted work was introduced into evidence. The estimate was made by G. L. Tuckwiler of Hermitage Construction Corporation and totalled $6,342. (Plaintiffs' Exhibit No. 4). The estimate included items of unfinished work which were not reflected on the 13 item list negotiated at the settlement.

At settlement, Heritage made available a mechanic's lien waiver on a form supplied by Lawyers Title Insurance Corporation, the purpose of which is to induce a title insurance company to issue its mortgagee title insurance policy free of exception to possible unfiled mechanic's and materialmen's liens. (Plaintiffs' Exhibit No. 9). Part III of the mechanic's lien waiver is an affidavit by the owner (Heritage) that all parties with whom it contracted have been paid in full. Carroll testified that he knew at that time that there were unpaid laborers and materialmen. It was his practice to obtain those signatures on this and other building construction projects prior to the completion of the work of the individual subcontractor and prior to the payment of those subcontractors so that he could present the lien waiver at closing and obtain the purchaser's funds to pay the subcontractors, materialmen and laborers.

American Overhead Door Company was a subcontractor who was not listed on the waiver form. It has filed a mechanic's lien against the property. Johnson Carpet Center, Inc., a subcontractor who did sign the mechanic's lien waiver form, also filed a mechanic's lien against the real estate.[1] Heritage and Carroll contend that the reason American Overhead Door Company was not included on the lien waiver form was that it was overlooked for there was no designated place for it to execute the lien waiver as it is for other subcontractors and materialmen. Heritage and Carroll further contend that it was a custom in the community to procure the signatures of subcontractors and materialmen before payments were made to them because the waiver, properly executed, was needed to induce the lender to make the loan proceeds available from which these materialmen and subcontractors were to be paid. Mr. Kendall Lipscomb, an attorney in the Richmond community, who closed the Snyders' loan, and who is familiar with real estate practice in this area, testified that it was not unusual for an owner or a general contractor to obtain the signatures of the materialmen and subcontractors on the mechanic's lien waiver prior to their being paid for those materials and services. He also testified that Lawyers Title Insurance Company had approved the lien waiver as being satisfactory for loan closing. The lien waiver (Plaintiffs' Exhibit No. 9) is a waiver by a materialman or a subcontractor to a right to impose a lien on the land superior to any party making a loan on the real estate. It states that the signatures are for services rendered, work done and materials furnished heretofore and *hereafter* by those signing.

Carroll was the President and sole stockholder of Heritage. The corporation was in the general contracting business and had dealt with subcontractors and built other houses before the Snyders' contract was executed. Carroll wrote the checks for the corporation. He executed the mechanic's lien waiver on behalf of the corporation and at that time he knew that the materialmen and subcontractors had not been paid in full.

On August 16, 1979, the checking account of Heritage at Virginia National Bank suffered an overdraft of $7,492.91. This overdraft was covered on August 17, 1979 by a deposit of $40,405.63 representing the net sale proceeds to Heritage from the confirmation of the sale to the Snyders (Plaintiffs' Exhibit No. 11). It was Carroll's contention that the overdraft occurred because he had written checks in anticipation of an earlier receipt of the settlement proceeds from the Snyders.

## CONCLUSIONS OF LAW

The Snyders contend that Heritage should be denied a discharge under § 14(c)(2), (3), (4) and (7) of the Bankruptcy Act of 1898, as amended, for the following reasons: (1) Heritage promised to complete the 13 unfinished items at a time when it

---

1. These mechanic's lien suits are being defended by Lawyers Title Insurance Corporation under its mortgagee title insurance policy insuring Snyders' mortgage lender against such risk.

The Complaints herein do not allege any loss by the Plaintiffs arising out of these mechanic's liens nor does the evidence establish that the Snyders have sustained any loss therefrom.

neither had the intention or ability to do so which conduct evidences fraud upon the Snyders; (2) that the submission of the false lien waiver constituted a fraud on the Snyders; (3) that at the time of settlement Heritage was insolvent and it purposely, willfully and fraudulently failed to reveal that fact to the Snyders; and (4) that subsequent to closing, the funds obtained from the Snyders were applied to debts of the corporation other than those incurred in the construction of the dwelling of the Snyders, in violation of Va.Code § 43–13. The Snyders further contend that because Paul R. Carroll was the President and sole stockholder of Heritage he should also be denied a discharge under said subsections, and that if the Court declines to deny the discharge of Heritage and Carroll, the Court should determine the debt due to the Snyders to be nondischargeable under § 17(a)(2), (4) and (8) of the Bankruptcy Act of 1898, as amended, and that they be granted judgment in the amount of $7,000 plus reasonable attorney's fees against Heritage and Carroll.

For the reasons hereinafter stated, this Court believes that the discharges to Heritage and Carroll should be granted and finds that the obligation of Heritage and Carroll to the Snyders should be found dischargeable in bankruptcy and that no judgment be entered against said Bankrupts.

Bankruptcy Act § 14(c)(2) provides that the court shall grant the discharge unless satisfied that the bankrupt has "destroyed, mutilated, falsified, concealed, or failed to keep or preserve books or accounts of records, from which its financial condition and business transactions might be ascertained, unless the court deems such acts or failures to have been justified under all the circumstances of the case...." From the evidence before the Court, this Court finds that neither Heritage nor Carroll have committed any of those alleged acts.

Bankruptcy Act § 14(c)(3) provides that the court shall grant the discharge unless the bankrupt:

"while engaged in business as ... an executive of a corporation, obtained for such business money or property on *credit* or as an extension or renewal of *credit* by making or publishing or causing to be made or published in any manner whatsoever a materially false statement in writing respecting his financial condition or the financial condition of such ... corporation...." (emphasis added).

The Snyders argue that the mechanic's lien waiver executed by Carroll on behalf of Heritage was a statement respecting the corporate Bankrupt's financial condition. The intended purpose of that document is to induce Lawyers Title Insurance Corporation to issue its policy of title insurance to the mortgage lender without exception to possible unfiled mechanics' and materialmen's liens. Lawyers Title had approved the waiver for that purpose. While this Court questions whether the lien waiver was issued for the purpose of obtaining credit, this Court does not believe it to be a statement reflecting the financial condition of Carroll or Heritage.

"It was never the intention of Congress to extend clause (3) [§ 14c (3)] to all cases of false written statements where credit happens to have been given. It should be confined to cases where the decision to give credit was induced by the false statement, which must have been, if not the moving cause behind the giving, extending or renewal of credit, a contributing cause, i. e.: the lender or seller must to an extent at least have relied upon it. It was formerly held that clause (3) was not confined in its application to statements of general financial condition but covered any material statement of fact made in writing to the creditor to induce the credit. Subsequently, the clause was limited in its application to statements respecting financial condition." 1A *Collier on Bankruptcy* ¶ 14.39 (14th ed.) (footnotes omitted)

Similarly, it cannot be said that the negotiated list of uncompleted items signed at the closing was a statement issued for the purpose of obtaining credit or reflecting the financial condition of either Carroll or Heritage.

Bankruptcy Act § 14(c)(4) provides that the court shall grant the discharge unless the bankrupt has "at any time subsequent to the first day of the twelve months immediately preceding the filing of the petition in bankruptcy, transferred, removed, destroyed, or concealed, or permitted to be removed, destroyed, or concealed, any of his property, with intent to hinder, delay, or defraud his creditors. . . ." This Court is not persuaded that either Heritage or Carroll engaged in such conduct.

Bankruptcy Act § 14(c)(7) provides that the court shall grant the discharge unless satisfied that the bankrupt "has failed to explain satisfactorily any losses of assets or deficiency of assets to meet his liabilities. . . ." The Complaint contains no specific allegation nor does the evidence or stipulations give any indication that either Heritage or Carroll has failed in this respect.

With the exception of § 14(c)(3) (which has been addressed above), the acts for which it is alleged Carroll is responsible for must of necessity arise out of his personal responsibility for the corporate acts of Heritage. In order to create his liability, the corporate veil must be pierced and he be held personally responsible.

■ As a general rule, the corporate entity should be recognized and upheld, unless unusual circumstances call for an exception. *Zubik v. Zubik*, 384 F.2d 267, 273 (3rd Cir. 1967). While the court in *Zubik* noted that bankruptcy cases call for a different evaluation of fraud or injustice in determining whether to pierce the corporate veil, there has been no showing of any unusual set of facts to persuade this Court to do so. In *In re County Green Limited Partnership*, 438 F.Supp. 701 (W.D.Va.1977) the district court held that the bankruptcy court's finding that a general contractor corporation was not the "alter ego" of the debtor corporation was erroneous. The factors used by the district court on appeal to determine whether to pierce the corporate veil included undercapitalization of the corporation, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation, siphoning of funds of the corporation by the dominate stockholder, non-functioning of officers or directors, absence of corporate records, and the fact that the corporation was merely a facade for the operation of the dominate stockholder. *County Green Limited Partnership, supra* at 705–6. That court found those factors present.

■ In the present case, the sales contract was executed by the corporation, the deed conveying the property was executed by the corporation, the mechanic's lien waiver was executed by the corporation, the settlement statement indicated the corporation to be the seller, the net sale proceeds were paid to the corporation and deposited to its corporate bank account. The addendum to the contract of sale and the agreement relative to 13 items to be completed subsequent to settlement were also executed by the corporation. Carroll's name appears on those documents only as President of Heritage. There is no evidence that Carroll concealed his corporate identity. There has been no convincing evidence presented which would persuade this Court to pierce the corporate veil and determine whether the individual conduct of Carroll merits a denial of discharge.

This Court has determined that Heritage's conduct was not such as to mandate a denial of discharge. It should be noted that had this Court determined the conduct of Heritage to be such as to require a denial of discharge, this Court would not have found Carroll's actions such as to prevent the granting of his discharge either by piercing the corporate veil to hold him accountable for the corporate acts or for such acts to which he may be personally liable.

The above discussion with respect to Carroll's personal liability or with his liability by piercing the corporate veil applies with equal force as to § 17(a)(2) and (8) discussed below, and as such, will not be reiterated.

Bankruptcy Act § 17(a)(2) provides that a discharge in bankruptcy shall release a bankrupt from all of his provable debts except such as:

"are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive, or for willful and malicious conversion of the property of another . . . ."

The mechanic's lien waiver provides for a release by a subcontractor or materialman for work or material *hereafter* rendered or supplied. It is a present waiver of past and future services to the property. Those parties[2] who were entitled to rely upon the mechanic's lien waiver were aware of the possibility of nonpayment at the time of execution of the waiver by those signing and the erroneousness of the affidavit contained in Part III of the waiver. It is common knowledge in the community that the contractor often needs the funds from the settlement to pay his subcontractors and materialmen in full and it is this waiver of liens which is acceptable to the title insurer that creates this possibility of payment of the amount due to the general contractor prior to his payment to the subcontractor. The subcontractors and materialmen are aware that they have not been paid. The title insurer also knows they have not been paid. It relies on the waiver of the right to file a lien for protection. To those parties who are not parties to the waiver and who are not entitled to rely on the document, no greater rights should exist.

The dischargeability issue alleged in this Complaint relates to the $7,000 the Snyders were called upon to expend to complete the construction of the dwelling. That is the only amount in the pleadings and in evidence and the Court's determination as to dischargeability arising out of the failure to complete the work shall only relate to that alleged sum and the manner in which that obligation arose.

■ It is always important to reiterate the obvious. A liability does exist. Neither Heritage nor Carroll completed the job. They had agreed to do so in the contract and in the subsequent agreement to complete the 13 items in the completion agreement. As a result of the contract and the subsequent agreement, Heritage obtained all the monies due to it with the exception of $1,000 which was to be paid upon the completion of the 13 items. This agreement was worked out between Heritage and the Snyders at settlement. The Snyders were represented by counsel. They could have demanded a larger escrow deposit but did not. It was a negotiated agreement. Carroll stated that he thought $1,000 would be sufficient to complete the items covered by the escrow deposit. Carroll still believes that had bankruptcy not intervened he could have completed the contract for that amount. The Snyders' evidence indicates that it would take an amount in excess of $6,000 to complete the job. Heritage and Carroll contend that Snyders' estimate is based upon matters in excess of what the 13 items constituted. Plaintiffs' Exhibit No. 4 tends to support this conclusion; however, it does not matter for the Court believes that the parties were acting in an arms-length transaction and where there is no clear and convincing evidence that Carroll or Heritage falsely represented that those matters could be completed for $1,000, or that there was no intention to do the work, the debt should be discharged. Additionally, there must have been reliance on the allegedly false representations of fraud. 1A *Collier on Bankruptcy* ¶ 17.16[3] (14th ed.). The fact that

---

2. It is the Court's belief that the lien waiver by its terms is for the benefit of the mortgage lender and the title insurance company that will affirmatively insure against a known risk when it issues a policy of title insurance to the lender without exception to possible unfiled mechanics' and materialmen's liens. The right to file a mechanic's lien exists for a period not to exceed 90 days from the completion of the improvements. Va.Code § 43–4. It is the waiver of the right to file a lien that becomes important to the title insurer, not the fact that payment has or has not been made.

the escrow account was established to insure completion of the work negates any material reliance on the lien waiver or the list of unfinished work negotiated at closing. Additionally, the evidence is not clear and convincing that Heritage never intended to do the work.

Moreover, the fact that Heritage lawfully obtained the proceeds at closing prevents a finding of willful and malicious conversion of property *of another*. That portion of the sales price which was willingly delivered became the property of Heritage. The property held in escrow has never been received by Heritage.

■ Section 17(a)(4) of the Bankruptcy Act provides that a discharge shall not release a bankrupt from a debt which is "created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity...." The Complaints allege that the funds obtained from the Snyders were applied to debts of the corporation for corporate obligations incurred in the construction of dwellings other than the one in question. The evidence on this point established that the proceeds from the loan were placed in the Heritage account and that two subcontractors were not paid. The evidence tends to support the conclusion that the funds were used in the operation of the business. The fact that two subcontractors did not get paid, without more is insufficient to establish fraud, defalcation or misappropriations. The Snyders contend that money paid by them to Heritage for a refrigerator was never received by the refrigerator company. Again, this without more is insufficient evidence to establish fraud, misappropriation or defalcation. No trust or fiduciary capacity was created. The Snyders gave the money to Heritage for the purchase of a refrigerator. A simple debtor-creditor relationship was created. The Snyders cite *Carey Lumber Co. v. Bell*, 615 F.2d 370 (5th Cir. 1980) to support their case. This case concerns a subcontractor's suit against the managing officer of the general contractor for nonpayment. In the present case no loss to the subcontractors has been established. The Snyders only seek to determine as nondischargeable any damages sustained as a result of the uncompleted items. That there may be an ultimate liability or loss to the Snyders as a result of the mechanic's lien suits is purely speculative. To the extent that the liens might indicate a course of conduct of Heritage and Carroll, it is short of clear and convincing evidence that the execution of the list of 13 items to be completed was done with such intent to defraud as to require the Court to find that the conduct violated § 17(a)(2) or (4) of the Bankruptcy Act.

Bankruptcy Act § 17a (8) provides that a discharge shall release a bankrupt from his debts except such as "are liabilities for willful and malicious injuries to the person or property of another...." Even if this Court could find that the failure to do an act; i. e., complete the 13 items, would constitute an injury to the property of another, this Court does not find that Heritage's or Carroll's failure to complete said items was either willful or malicious.

A final note is in order. The entire thrust of the Complaint concerns the necessity of the Snyders to complete the unfinished work at their own expense when they had agreed with Heritage and Carroll that Heritage would complete the work. Any loss the Snyders may have suffered as a result of the nonperformance by Heritage was due to the insufficiency of the escrow account which the Snyders and Heritage negotiated. The Snyders could have declined to accept the property, could have declined to settle, or could have negotiated for a larger escrow account to insure compliance and to provide the necessary capital if Heritage failed to complete the work. There is no evidence of fraud in the negotiation of the escrow account in deceiving the Snyders into accepting the escrow account when it was insufficient. This escrow account negates any reliance that the Snyders may claim they put on the negotiated agreement of unfinished work or the lien waiver.

An appropriate order will issue.